IN RE KM

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-044-CV

IN THE INTEREST OF K.M., A CHILD 

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

This is a termination of parental rights appeal.  Following a bench trial in February 2004, the trial court terminated the parental rights of Appellant Yama H. in her eleven-year-old daughter, K.M.  The trial court also terminated the parental rights of Appellant Juan M., K.M.’s alleged biological father.
(footnote: 2)  In seven issues, Juan and Yama contend:  the evidence is factually insufficient to show that termination is in the best interest of K.M.; Yama asserts the evidence is factually insufficient to show the four grounds relied upon for termination of her parental rights; and Yama contends the trial court erred in denying her motion for temporary orders pending appeal.  We affirm.

Procedural History

On October 3, 2002, the Texas Department of Protective and Regulatory Services (TDPRS)
(footnote: 3) filed an original petition for protection of K.M., for conservatorship, and for termination of the parent-child relationship between Juan and Yama and K.M.  Following a bench trial, the court found that both Juan and Yama had violated various grounds in the family code and that termination of the parental rights of Juan and Yama was in the best interest of K.M.   

Background

Juan is K.M.’s father and Yama is K.M.’s mother.  Juan and Yama began living together when Yama was fourteen years old and Juan was twenty-five years old.  K.M. is the youngest of their three children.  Juan and Yama lived with their three children and their oldest daughter’s boyfriend, Juan’s sister and her two children, and Juan’s mother.

The record does not reflect exactly who made a referral to Child Protective Services (CPS), but on August 26, 2002 Lindsey Dula, a CPS investigator, received a referral that allegations had been made that nine-year-old K.M. had been abused by her father Juan.  Dula interviewed K.M. who told her that Juan had touched her on her private parts, including her breasts, bottom, and the inside of her vagina,
(footnote: 4) and had touched her 20-30 times from the time she was five years of age until she was nine years of age.  K.M. said that the abuse would occur when Juan was drinking and when no one else was present.  K.M. told Dula that Juan would kiss her on the mouth and his tongue would touch her mouth; he kissed her like he kisses her mother.  K.M. also told Dula that Juan touched and squeezed her breasts underneath her clothes, and touched the inside of her vagina with his hand and it hurt.  She also described to Dula penile-vaginal penetration when she was five years old.
(footnote: 5)
 On January 12, 2004, Juan pled guilty to three felony offenses concerning his conduct with K.M.:  aggravated sexual assault of a child under age 14 (receiving 55 years’ confinement); and two offenses of indecency with a child by contact (receiving 20 years’ confinement in each case).
(footnote: 6)
 None of the witnesses testifying at the civil trial involving the termination of Appellants’ parental rights indicated that Yama had any knowledge about Juan’s alleged actions prior to the time of K.M.’s outcry.   

Burden Of Proof In Termination Proceedings

A parent’s rights to “the companionship, care, custody, and management” of his or her children are constitutional interests “far more precious than any property right.”  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982).  “While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.”  
In re C.H.
, 89 S.W.3d 17, 26 (Tex. 2002).

In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit.  
Tex. Fam. Code Ann.
 § 161.206(b) (Vernon Supp. 2004-05); 
Holick v. Smith
, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  
Holick,
 685 S.W.2d at 20-21;
 In re D.T.
, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  
Tex. Fam. Code Ann. 
§ 161.001 (Vernon 2002); 
Richardson v. Green
, 677 S.W.2d 497, 499 (Tex. 1984); 
Swate v. Swate
, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  
Tex. Fam. Code Ann. 
§§ 161.001, 161.206(a); 
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.  
G.M.
, 596 S.W.2d at 847; 
D.T.
, 34 S.W.3d at 630.  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”
  Tex. Fam. Code Ann.
 § 101.007 (Vernon 2002).  

Trial Court’s Findings

Although requested, the trial court did not file findings of fact and conclusions of law.  In its judgment, the trial court found that both Juan and Yama knowingly placed or knowingly allowed K.M. to remain in conditions or surroundings which endangered K.M.’s physical or emotional well-being; and both Juan and Yama engaged in conduct or knowingly placed K.M. with persons who engaged in conduct which endangered her physical or emotional well-being.
(footnote: 7) 

The trial court additionally found that Juan had been convicted of being criminally responsible for the death or serious bodily injury of a child under several specified penal code sections.
(footnote: 8)  The trial court also found that Juan had knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement and inability to care for K.M. for not less than two years from the date the petition was filed.
(footnote: 9)
 Lastly, the court found that it is in K.M.’s best interest to terminate the parental rights of both Juan and Yama.
(footnote: 10)
Appellants’ Issues On Appeal

Juan does not challenge the sufficiency of the evidence to support any of the grounds for termination.  Yama challenges the factual sufficiency of the evidence to support the four grounds for termination.  Both Appellants challenge the factual sufficiency of the evidence to support the trial court’s finding that it is in the best interest of K.M. that their parental rights be terminated.  Yama also contends the trial court erred in denying her motion for temporary orders pending appeal.

Standard Of Review

In a trial to the court where no findings of fact or conclusions of law are filed, the trial court’s judgment implies all findings of fact necessary to support it.  
Pharo v. Chambers County
, 922 S.W.2d 945, 948 (Tex. 1996).  Where a reporter’s record is filed, however, these implied findings are not conclusive, and an appellant may challenge them by raising both legal and factual sufficiency of the evidence issues.  
BMC Software Belg., N.V. v. Marchand
, 83 S.W.3d 789, 795 (Tex. 2002).  Where such issues are raised, the applicable standard of review is the same as that to be applied in the review of jury findings or a trial court’s findings of fact.  
Roberson v. Robinson
, 768 S.W.2d 280, 281 (Tex. 1989).

The higher burden of proof in termination cases alters the appellate standard of factual sufficiency review.  
C.H.
, 89 S.W.3d at 25.  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”  
Id
.  In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine “whether the evidence is such that a factfinder could reasonably form a firm belief or conviction” that the grounds for termination were proven.  
Id
.  Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent’s parental rights would be in the best interest of the child.  
Id
. at 28.

Grounds For Termination Of Yama’s Parental Rights

The court found that Yama violated two provisions of the family code dealing with endangerment of a child.  
See
 
Tex. Fam. Code Ann.
 § 161.001(1)(D), (E).  Yama challenges the factual sufficiency to support both these grounds for the termination of her parental rights.

Texas Family Code Section 161.001(1)(E)

Under this section, Yama’s parental rights may be terminated if the trial court found by clear and convincing evidence that Yama “engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.”  
Id
. § 161.001(1)(E).  "Endanger" means "to expose to loss or injury; to jeopardize."  
In re M.C.
, 917 S.W.2d 268, 269 (Tex. 1996).  There must be evidence of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct.  
In re R.D.
, 955 S.W.2d 364, 367-68 (Tex. App.—San Antonio 1997, pet. denied).  The parental conduct under subsection (E) requires a "course of conduct."  
Id.

TDPRS acknowledges that no one contends Yama had knowledge of Juan’s sexual abuse of K.M. while it was occurring.  However, TDPRS argues that Yama’s subsequent conduct in completely disbelieving K.M.’s allegations that Juan committed any of the abusive conduct amounts to a course of conduct that is emotionally abusive to K.M. and places her at risk.

Pursuant to a request from K.M.’s caseworker, Yama attended individual counseling sessions with a psychologist, worked with a therapist, and completed a course for parents of survivors of sexual abuse that was presented by CPS.  The caseworker acknowledged that Yama loves K.M., and that Yama was cooperative in doing the required programs and the visitations with K.M.
(footnote: 11)
 However, Yama has consistently informed all the caseworkers, counselors, and therapists that she believes K.M. is lying about what K.M. insists Juan did to her.  Yama reaffirmed her belief at trial and testified repeatedly that notwithstanding the fact that Juan failed a polygraph test and pled guilty to the felony aggravated sexual assault allegation and two indecency allegations, all concerning K.M., Yama still does not believe any of the sexual abuse allegations made by K.M.  Yama feels that the trouble that has happened to Juan and Yama is all a result of K.M.’s lies.  Yama recognizes that K.M. knows Yama thinks she is lying, and that K.M. is aware that neither her sister, grandmother, nor any of the other people that are living in Yama’s home believe K.M.’s allegations against Juan.  Yama stated she had no idea how this made K.M. feel.

Yama testified that the therapist discussed with her the idea that when Yama and Juan became involved in a relationship at ages fourteen and twenty-five, respectfully, that this was sexual abuse.  However, Yama thought that her relationship with Juan was not improper because she is the one who pursued him.  Yama stated that the caseworker explained to her that Yama needed to support K.M. so she could get over it, but Yama stated she didn’t know what K.M. needed support for.  When asked at trial if Juan was not incarcerated and was free, would she have any concerns about Juan being around K.M., she responded “No, not really.”

Leslie Bechdoldt, CPS’s ongoing caseworker, testified that she was responsible for developing a service plan for Yama, and that her primary goal was to get the family to believe that the allegations made by K.M. were true, and to support her in that regard.  The ultimate goal of the service plan was that Yama was going to have to believe K.M. and be able to support her in that family environment.  CPS determined that Yama needed to believe K.M. in order to be able to honestly protect her from Juan ever being allowed to sexually abuse her again.  Further, Yama needed to be able to believe K.M. to protect her emotionally because of the emotional abuse K.M. had endured with her family after she made the allegations against Juan and before she was placed in foster care.  Bechdoldt arranged for Yama to go to individual counseling with Laura Greuner, but after Yama finished with individual counseling and attended the non-offending mothers’ group class, she continued to have the same viewpoints as she did when she began the service plan.  Yama failed to see how anything in the classes applied to her, and she still did not believe K.M.’s allegations.  Bechdoldt continues to have ongoing conversations with Yama about the need for her to be supportive of K.M., but Yama either says she does not believe K.M. or that she doesn’t know what to say.

Laura Greuner testified that she is a therapist with a master’s degree in social work; she deals primarily with sexually abused children and their families.  Greuner worked with Yama and K.M. individually to help K.M. work through her sexual abuse issues and her sadness at being separated from her family, and to help Yama to be able to learn to believe K.M. and to support her regarding the sexual abuse.  Greuner stated that she was not able to make any progress with Yama because Yama never came to an understanding about the sexual abuse allegations made by K.M.  Greuner confirmed that K.M. knows Yama still doesn’t believe that the abuse occurred.  She testified regarding her expert opinion concerning the future relationship between Yama and K.M., as follows:   Q Based on your work with both [Yama] and [K.M.], do you believe that [K.M.] would be safe emotionally and physically if she was returned home to her mother's care?

A No.

Q What concerns would you have for [K.M.] if she was returned home?

A Well, she had a devastating thing happen in her life, which is her sexual abuse by her father, and she cannot talk to the mother about that.  She can barely write a letter to her mother about it and I don't think she would ever tell if anything happened to her again, she's too afraid and she already feels like she's in trouble for what she said about her dad to begin with so I think it sets her up to be in a high risk situation where she has no support and really no protection and I don't think she has any belief that her mother is going to keep her father away from her.

Q Her father has been found guilty of these charges and has been sentenced to a lengthy prison term.  Knowing that he potentially will be incarcerated for a number of years, do you still have concerns about [K.M.]'s emotional health if she was returned home?

A Yes.

Q Okay.  What concerns are those?

A Just that she's not -- she knows she's not believed about the abuse and I think that she wouldn't be able to -- when kids are sexually abused, they continue many times to have issues concerning that throughout their lifetimes, really, and I don't think that -- I don't see how [Yama] could address those with her or help her through those or anything because she doesn't believe it ever happened to begin with.  

And I think that's a very damaging situation to go through what [K.M.] went through, and you're put somewhere where you're told that that never even happened, and the person, the offender that molested you, is not the type of person that could do that, and how could you ever say that about your father?

I think living in that kind of situation would be very emotionally damaging for her.  It would make -- and eventually she will have, more than likely, more sexual abuse issues.  She already does.  She has other issues that she's dealing with, and I'm not sure [Yama] could be in a position to help her with those.

The therapist continued her conclusions concerning K.M.’s relationship with her 

family: 

Q If [K.M.] knew that Juan was not coming back, do you think that her sessions would -- she would, I guess, lose all these fears that she has about coming back home?

A No, I don't think she would.

Q Why not?

A Because one of her fears surrounds the way she was treated when she made her outcry and not being believed and not being really supported and you're trying to recover from sexual victimization, not being supported in that way.  And I don't think those things have changed.  I don't know if she would feel safe that he wouldn't end up coming back anyway.  

. . . .

A She said that [K.M.’s sister] yelled at her and screamed at her about the outcry that she made about sexual abuse.

Q Okay.  And if [K.M.] were returned to an environment where she was living on a day-to-day basis with her sister, her sisters' -- and if those attitudes remained, her sisters' attitudes, would that be detrimental to [K.M.]?

A Yes.

Q Is there kind of a point in time in which for the healing process or the recovery process of a child who is a victim of sexual abuse needs to be able to move on as opposed to waiting to see whether the non-perpetrating person in the household can come to grips with this?  I mean, can [K.M.] treat with you for ten years and then [Yama] says okay, I believe and that would still be a healthy environment?

A I think she needs to move on now.  I think it's been long enough already, and at this point, you'd have to question the sincerity of [Yama] believing, because why after all this time would that all of a sudden happen, you know?

Q And further, would you agree that [Yama] and [K.M.’s sister] and the other family members, their failure to believe [K.M.]'s outcry and I guess their going a step further and telling her that she's lied about it or created some trouble, does that just kind of further emotional damage to [K.M.]?

A Yes. 

Our review of the evidence shows that Yama has repeatedly, frequently, and consistently stated that she believes K.M. is lying about the sexual abuse allegations.  Yama made her viewpoint clear to the occupants of her household  and they also believe K.M. is lying.  Yama feels that the problems between herself and Juan are all a result of K.M.’s lies.  Notwithstanding many attempts by a psychologist, a caseworker, and a therapist to help Yama accept the veracity of K.M.’s allegations so that Yama could assist K.M. in getting through this time of crisis, and despite Juan’s having pled guilty to these three felony offenses, Yama continues to deny that her daughter’s allegations are true.  K.M. is acutely aware that Yama does not believe her allegations and that Yama thinks she is lying about what Juan did to her.  The evidence established that by her conduct in continuing to disbelieve K.M.’s allegations, Yama is unable to provide a safe and stable environment for K.M.

Applying the appropriate standards of review, we find that there is factually sufficient evidence to support termination of Yama’s parental rights based upon the grounds listed in section 161.001(1)(E), that Yama knowingly engaged in conduct which endangered K.M.’s physical or emotional well-being.
(footnote: 12)  We overrule Yama’s fifth issue.

Additional grounds for termination

If multiple conduct grounds are alleged for termination, the evidence is factually sufficient if it supports just one of the alleged conduct grounds.  
In re W.J.H.
, 111 S.W.3d 707, 715 (Tex. App.—Fort Worth 2003, pet. denied).  Therefore, we are not required to address whether the evidence is sufficient to establish termination under section 161.001(1)(D).  We overrule Yama’s fourth issue.  

In her sixth and seventh issues Yama asserts the evidence is factually insufficient to show that she executed an unrevoked or irrevocable affidavit of relinquishment
(footnote: 13) or that she constructively abandoned K.M.
(footnote: 14)  Because we have found the evidence sufficient to support termination under section 161.001(1)(E), we are not required to address whether the evidence is sufficient to establish termination pursuant to these two alternative grounds for termination.  
See W.J.H.
, 111 S.W.3d at 715.  Additionally, we note that these grounds are not listed in the trial court’s judgment, although they were listed in TPDRS’s petition.  However, because TDPRS agrees that no evidence of either of these grounds was introduced at trial and that the termination judgment cannot be affirmed on these grounds, we sustain Yama’s sixth and seventh issues. 

Best Interest Findings
 

Both Juan and Yama challenge the factual sufficiency of the trial court’s findings that it is in the best interest of K.M. to terminate their parental rights.

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include: the desires of the child;

the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent.
  Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).  These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C.H
., 89 S.W.3d at 27. 

All of the evidence previously recited is relevant to our review of the best interest determination made by the trial court.  Additionally, although Yama participated in the programs and counseling required by CPS, her attitude toward K.M. and the allegations K.M. made about Juan remains unchanged.  As a result, K.M.’s therapist and caseworker both testified that there exists a danger to K.M. that she will be unable to report any further abuse to her family given their stubborn and vocal refusal to believe her.  As K.M.’s therapist explained, this sets K.M. up to be in a high risk situation where she has no support and really no protection.  K.M.’s caseworker opined that it was CPS’s viewpoint that it was best for K.M. to be adopted and K.M. agreed and has voiced her desire to be adopted.

Having thoroughly reviewed the evidence, we hold the evidence is factually sufficient to support the trial court’s findings that termination of Juan’s and Yama’s parental rights is in the best interest of K.M.  We overrule Appellants’ first and second issues. 

Yama’s Motion For Temporary Orders

In her third issue, Yama contends the trial court erred by denying her  motion for temporary orders regarding visitation pending appeal.  Section 109.001 of the family code authorizes the trial court, within 30 days after an appeal is perfected, to make temporary orders to be effective during the pendency of an appeal.  
Tex. Fam. Code Ann.
 § 109.001 (Vernon 2002).  However, subsection (d) provides that the court may not suspend the operation of a judgment terminating the parent-child relationship.  
Id.
 § 109.001(d).  

At a post-judgment hearing on Yama’s motion for temporary orders, the trial court found it was not authorized to suspend the operation of the termination judgment, but that if the court did have such authority to grant visitation pending appeal it would not do so because it would not be in K.M.’s best interest.
(footnote: 15)
 The hearing on Yama’s motion for temporary orders, and the trial court’s denial, was within the time permitted by section 109.001(a).  Yama argues that granting visitation to her during the pendency of the appeal is not prohibited by section 109.001(d) because it would not suspend the operation of the judgment terminating her parent-child relationship with K.M., 
see id.
, but would simply be in addition to the judgment being appealed.

The State responds that the complained of ruling is not properly before this court because section 109.001(c) provides that “A temporary order rendered under this section is not subject to interlocutory appeal.”  
Id.
 § 109.001(c).  Yama counters with the argument that she is not seeking to appeal from an interlocutory order, but from a final judgment terminating her parental rights which also includes the trial court’s denial of her motion for post-judgment orders.

A temporary order under section 109.001 is only appropriate if a final judgment has been signed and a notice of appeal has been filed.  
See id. 
§ 109.001(a).  This statute specifically prohibits an appeal from any temporary order rendered under this section.  
See id.
 § 109.001(c).  Therefore, we hold we lack jurisdiction over Yama’s complaint regarding the denial of her request for temporary orders pending appeal.  
See
 
In re Gonzalez
, 993 S.W.2d 147, 162 (Tex. App.—San Antonio 1999, no pet.) (holding challenge to temporary orders entered under section 109.001(a) is not proper subject for appeal, and mandamus is proper remedy); 
Johnson v. Johnson
, 948 S.W.2d 835, 838 (Tex. App.—San Antonio 1997, writ denied) (holding award of attorney’s fees under section 109.001(a) is not subject to appeal and mandamus is proper remedy).  We dismiss Yama’s third issue for want of jurisdiction.

Conclusion

We affirm the trial court’s judgment terminating the parental rights of Juan M. and Yama H. in the minor child K.M.

PER CURIAM

PANEL F: HOLMAN, J.; CAYCE, C.J.; and LIVINGSTON, J.

DELIVERED:  November 12, 2004

FOOTNOTES
1:
See 
Tex. R. App. P. 
47.4.

2:
To protect the privacy of the parties involved in this appeal, we identify the child by initials only and the appellants by first names only.  
See
 
Tex. Fam. Code Ann.
 § 109.002(d) (Vernon 2002).

3:
Effective February 1, 2004, the name of the agency changed to the Texas Department of Family and Protective Services.  However, for the sake of consistency in this case, we will continue to use TDPRS when we refer to the agency.

4:
The use of the term “vagina” was Dula’s word; she testified that K.M. “had no identifying name for the vagina” but used anatomically correct dolls to  show Dula what Juan had done.

5:
Dula videotaped her interview with K.M. but the tape was not viewed by the trial court or offered into evidence; therefore, it is not a part of the appellate record.  K.M. did not testify at trial and the judge exercised her discretion not to conduct an ex parte interview with K.M.

6:
Juan’s convictions were affirmed on appeal and mandate has issued.  In our continuing effort to protect the privacy of the parties in the current suit, we will refrain from listing the citation to the criminal case.

7:
See id
. § 161.001(1)(D), (E).

8:
See id.
 § 161.001(1)(L). 

9:
See id.
 § 161.001(1)(Q). 

10:
See id.
 § 161.001(2).

11:
Yama complied with the terms of CPS’s safety plan except in two instances.  On one occasion, Yama permitted Juan to come over to the house (after he was released on bond) to pick up his clothes, but Yama had K.M. stay upstairs so she wouldn’t have any contact with Juan.  Yama’s caseworker acknowledged that she had told Yama that Juan needed his clothes and it is possible that Yama misunderstood the meaning of what contact was permitted.  There was also one occasion when Yama was talking on the telephone with Juan who had called from jail, and Yama agreed with K.M.’s request to speak with her father. 

12:
See also
 
In re W.L.
, No. 05-00-02023-CV, 2002 WL 312493, at *3 (Tex. App.—Dallas Feb. 28, 2002, no pet.) (not designated for publication) (holding evidence sufficient to support violation of section 161.001(1)(E) where mother did not believe father fondled their five-year-old girl and mother stated she did not believe she needed to protect her other daughters from the father). 

13:
See 
Tex. Fam. Code Ann.
 § 161.001(1)(K).

14:
See id.
 § 161.001(1)(N).

15:
This ruling is not contained in a written order but is set out in the reporter’s record from the hearing; additionally, the court’s docket sheet reflects that the motion for temporary orders was denied.