COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-044-CV
 
 
 
IN 
THE INTEREST OF K.M., A CHILD
 
 
 
------------
 
FROM 
THE 323RD DISTRICT COURT OF TARRANT COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
        This 
is a termination of parental rights appeal.  Following a bench trial in 
February 2004, the trial court terminated the parental rights of Appellant Yama 
H. in her eleven-year-old daughter, K.M.  The trial court also terminated 
the parental rights of Appellant Juan M., K.M.’s alleged biological father.[2]  In seven issues, Juan and Yama contend: the evidence 
is factually insufficient to show that termination is in the best interest of 
K.M.; Yama asserts the evidence is factually insufficient to show the four 
grounds relied upon for termination of her parental rights; and Yama contends 
the trial court erred in denying her motion for temporary orders pending appeal.  
We affirm.
Procedural 
History
        On 
October 3, 2002, the Texas Department of Protective and Regulatory Services 
(TDPRS)[3] filed an original petition for protection 
of K.M., for conservatorship, and for termination of the parent-child 
relationship between Juan and Yama and K.M. Following a bench trial, the court 
found that both Juan and Yama had violated various grounds in the family code 
and that termination of the parental rights of Juan and Yama was in the best 
interest of K.M.
Background
        Juan 
is K.M.’s father and Yama is K.M.’s mother.  Juan and Yama began living 
together when Yama was fourteen years old and Juan was twenty-five years old.  
K.M. is the youngest of their three children.  Juan and Yama lived with 
their three children and their oldest daughter’s boyfriend, Juan’s sister 
and her two children, and Juan’s mother.
        The 
record does not reflect exactly who made a referral to Child Protective Services 
(CPS), but on August 26, 2002 Lindsey Dula, a CPS investigator, received a 
referral that allegations had been made that nine-year-old K.M. had been abused 
by her father Juan.  Dula interviewed K.M. who told her that Juan had 
touched her on her private parts, including her breasts, bottom, and the inside 
of her vagina,[4] and had touched her 20-30 times from 
the time she was five years of age until she was nine years of age.  K.M. 
said that the abuse would occur when Juan was drinking and when no one else was 
present. K.M. told Dula that Juan would kiss her on the mouth and his tongue 
would touch her mouth; he kissed her like he kisses her mother.  K.M. also 
told Dula that Juan touched and squeezed her breasts underneath her clothes, and 
touched the inside of her vagina with his hand and it hurt.  She also 
described to Dula penile-vaginal penetration when she was five years old.[5]
        On 
January 12, 2004, Juan pled guilty to three felony offenses concerning his 
conduct with K.M.: aggravated sexual assault of a child under age 14 (receiving 
55 years’ confinement); and two offenses of indecency with a child by contact 
(receiving 20 years’ confinement in each case).[6]
        None 
of the witnesses testifying at the civil trial involving the termination of 
Appellants’ parental rights indicated that Yama had any knowledge about 
Juan’s alleged actions prior to the time of K.M.’s outcry.
Burden Of Proof 
In Termination Proceedings
        A 
parent’s rights to “the companionship, care, custody, and management” of 
his or her children are constitutional interests “far more precious than any 
property right.”  Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S. 
Ct. 1388, 1397 (1982).  “While parental rights are of constitutional 
magnitude, they are not absolute.  Just as it is imperative for courts to 
recognize the constitutional underpinnings of the parent-child relationship, it 
is also essential that emotional and physical interests of the child not be 
sacrificed merely to preserve that right.”  In re C.H., 89 S.W.3d 
17, 26 (Tex. 2002).
        In 
a termination case, the State seeks not just to limit parental rights but to end 
them permanently—to divest the parent and child of all legal rights, 
privileges, duties, and powers normally existing between them, except for the 
child’s right to inherit.  Tex. 
Fam. Code Ann. § 161.206(b) (Vernon Supp. 2004-05); Holick v. Smith, 
685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination 
proceedings and strictly construe involuntary termination statutes in favor of 
the parent.  Holick, 685 S.W.2d at 20-21; In re D.T., 34 
S.W.3d 625, 630 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).
        In 
proceedings to terminate the parent-child relationship brought under section 
161.001 of the family code, the petitioner must establish one or more of the 
acts or omissions enumerated under subdivision (1) of the statute and must also 
prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (Vernon 
2002); Richardson v. Green, 677 S.W.2d 497, 499 (Tex. 1984); Swate v. 
Swate, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  Both 
elements must be established; termination may not be based solely on the best 
interest of the child as determined by the trier of fact.  Tex. Dep’t 
of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).
        Termination 
of parental rights is a drastic remedy and is of such weight and gravity that 
due process requires the petitioner to justify termination by clear and 
convincing evidence.  Tex. Fam. Code 
Ann. §§ 161.001, 161.206(a); In re G.M., 596 S.W.2d 846, 847 
(Tex. 1980).  This intermediate standard falls between the preponderance 
standard of ordinary civil proceedings and the reasonable doubt standard of 
criminal proceedings.  G.M., 596 S.W.2d at 847; D.T., 34 
S.W.3d at 630. It is defined as the “measure or degree of proof that will 
produce in the mind of the trier of fact a firm belief or conviction as to the 
truth of the allegations sought to be established.” Tex. Fam. Code Ann. § 101.007 (Vernon 
2002).
Trial Court’s 
Findings
        Although 
requested, the trial court did not file findings of fact and conclusions of law.  
In its judgment, the trial court found that both Juan and Yama knowingly placed 
or knowingly allowed K.M. to remain in conditions or surroundings which 
endangered K.M.’s physical or emotional well-being; and both Juan and Yama 
engaged in conduct or knowingly placed K.M. with persons who engaged in conduct 
which endangered her physical or emotional well-being.[7]
        The 
trial court additionally found that Juan had been convicted of being criminally 
responsible for the death or serious bodily injury of a child under several 
specified penal code sections.[8]  The trial 
court also found that Juan had knowingly engaged in criminal conduct that 
resulted in his conviction of an offense and confinement and inability to care 
for K.M. for not less than two years from the date the petition was filed.[9]
        Lastly, 
the court found that it is in K.M.’s best interest to terminate the parental 
rights of both Juan and Yama.[10]
Appellants’ 
Issues On Appeal
        Juan 
does not challenge the sufficiency of the evidence to support any of the grounds 
for termination.  Yama challenges the factual sufficiency of the evidence 
to support the four grounds for termination.  Both Appellants challenge the 
factual sufficiency of the evidence to support the trial court’s finding that 
it is in the best interest of K.M. that their parental rights be terminated.  
Yama also contends the trial court erred in denying her motion for temporary 
orders pending appeal.
Standard Of 
Review
        In 
a trial to the court where no findings of fact or conclusions of law are filed, 
the trial court’s judgment implies all findings of fact necessary to support 
it.  Pharo v. Chambers County, 922 S.W.2d 945, 948 (Tex. 1996).  
Where a reporter’s record is filed, however, these implied findings are not 
conclusive, and an appellant may challenge them by raising both legal and 
factual sufficiency of the evidence issues.  BMC Software Belg., N.V. v. 
Marchand, 83 S.W.3d 789, 795 (Tex. 2002).  Where such issues are 
raised, the applicable standard of review is the same as that to be applied in 
the review of jury findings or a trial court’s findings of fact.  Roberson 
v. Robinson, 768 S.W.2d 280, 281 (Tex. 1989).
        The 
higher burden of proof in termination cases alters the appellate standard of 
factual sufficiency review.  C.H., 89 S.W.3d at 25.  “[A] 
finding that must be based on clear and convincing evidence cannot be viewed on 
appeal the same as one that may be sustained on a mere preponderance.”  Id.  
In considering whether the evidence of termination rises to the level of being 
clear and convincing, we must determine “whether the evidence is such that a 
factfinder could reasonably form a firm belief or conviction” that the grounds 
for termination were proven.  Id.  Our inquiry here is whether, 
on the entire record, a factfinder could reasonably form a firm conviction or 
belief that the parent violated one of the conduct provisions of section 
161.001(1) and that the termination of the parent’s parental rights would be 
in the best interest of the child.  Id. at 28.
Grounds For 
Termination Of Yama’s Parental Rights
        The 
court found that Yama violated two provisions of the family code dealing with 
endangerment of a child.  See Tex. 
Fam. Code Ann. § 161.001(1)(D), (E).  Yama challenges the factual 
sufficiency to support both these grounds for the termination of her parental 
rights.
Texas Family 
Code Section 161.001(1)(E)
        Under 
this section, Yama’s parental rights may be terminated if the trial court 
found by clear and convincing evidence that Yama “engaged in conduct or 
knowingly placed the child with persons who engaged in conduct which endangers 
the physical or emotional well-being of the child.”  Id. § 
161.001(1)(E).  "Endanger" means "to expose to loss or 
injury; to jeopardize."  In re M.C., 917 S.W.2d 268, 269 (Tex. 
1996).  There must be evidence of endangerment to the child's physical or 
emotional well-being as the direct result of the parent's conduct.  In 
re R.D., 955 S.W.2d 364, 367-68 (Tex. App.—San Antonio 1997, pet. denied).  
The parental conduct under subsection (E) requires a "course of 
conduct."  Id.
        TDPRS 
acknowledges that no one contends Yama had knowledge of Juan’s sexual abuse of 
K.M. while it was occurring.  However, TDPRS argues that Yama’s 
subsequent conduct in completely disbelieving K.M.’s allegations that Juan 
committed any of the abusive conduct amounts to a course of conduct that is 
emotionally abusive to K.M. and places her at risk.
        Pursuant 
to a request from K.M.’s caseworker, Yama attended individual counseling 
sessions with a psychologist, worked with a therapist, and completed a course 
for parents of survivors of sexual abuse that was presented by CPS.  The 
caseworker acknowledged that Yama loves K.M., and that Yama was cooperative in 
doing the required programs and the visitations with K.M.[11]
        However, 
Yama has consistently informed all the caseworkers, counselors, and therapists 
that she believes K.M. is lying about what K.M. insists Juan did to her.  
Yama reaffirmed her belief at trial and testified repeatedly that 
notwithstanding the fact that Juan failed a polygraph test and pled guilty to 
the felony aggravated sexual assault allegation and two indecency allegations, 
all concerning K.M., Yama still does not believe any of the sexual abuse 
allegations made by K.M.  Yama feels that the trouble that has happened to 
Juan and Yama is all a result of K.M.’s lies.  Yama recognizes that K.M. 
knows Yama thinks she is lying, and that K.M. is aware that neither her sister, 
grandmother, nor any of the other people that are living in Yama’s home 
believe K.M.’s allegations against Juan.  Yama stated she had no idea how 
this made K.M. feel.
        Yama 
testified that the therapist discussed with her the idea that when Yama and Juan 
became involved in a relationship at ages fourteen and twenty-five, 
respectfully, that this was sexual abuse.  However, Yama thought that her 
relationship with Juan was not improper because she is the one who pursued him.  
Yama stated that the caseworker explained to her that Yama needed to support 
K.M. so she could get over it, but Yama stated she didn’t know what K.M. 
needed support for.  When asked at trial if Juan was not incarcerated and 
was free, would she have any concerns about Juan being around K.M., she 
responded “No, not really.”
        Leslie 
Bechdoldt, CPS’s ongoing caseworker, testified that she was responsible for 
developing a service plan for Yama, and that her primary goal was to get the 
family to believe that the allegations made by K.M. were true, and to support 
her in that regard.  The ultimate goal of the service plan was that Yama 
was going to have to believe K.M. and be able to support her in that family 
environment.  CPS determined that Yama needed to believe K.M. in order to 
be able to honestly protect her from Juan ever being allowed to sexually abuse 
her again.  Further, Yama needed to be able to believe K.M. to protect her 
emotionally because of the emotional abuse K.M. had endured with her family 
after she made the allegations against Juan and before she was placed in foster 
care.  Bechdoldt arranged for Yama to go to individual counseling with 
Laura Greuner, but after Yama finished with individual counseling and attended 
the non-offending mothers’ group class, she continued to have the same 
viewpoints as she did when she began the service plan.  Yama failed to see 
how anything in the classes applied to her, and she still did not believe 
K.M.’s allegations.  Bechdoldt continues to have ongoing conversations 
with Yama about the need for her to be supportive of K.M., but Yama either says 
she does not believe K.M. or that she doesn’t know what to say.
        Laura 
Greuner testified that she is a therapist with a master’s degree in social 
work; she deals primarily with sexually abused children and their families. 
Greuner worked with Yama and K.M. individually to help K.M. work through her 
sexual abuse issues and her sadness at being separated from her family, and to 
help Yama to be able to learn to believe K.M. and to support her regarding the 
sexual abuse.  Greuner stated that she was not able to make any progress 
with Yama because Yama never came to an understanding about the sexual abuse 
allegations made by K.M.  Greuner confirmed that K.M. knows Yama still 
doesn’t believe that the abuse occurred.  She testified regarding her 
expert opinion concerning the future relationship between Yama and K.M., as 
follows:
 
Q Based on your work with both [Yama] and [K.M.], do you believe that [K.M.] 
would be safe emotionally and physically if she was returned home to her 
mother's care?
 
A 
No.
 
Q 
What concerns would you have for [K.M.] if she was returned home?
 
A 
Well, she had a devastating thing happen in her life, which is her sexual abuse 
by her father, and she cannot talk to the mother about that.  She can 
barely write a letter to her mother about it and I don't think she would ever 
tell if anything happened to her again, she's too afraid and she already feels 
like she's in trouble for what she said about her dad to begin with so I think 
it sets her up to be in a high risk situation where she has no support and 
really no protection and I don't think she has any belief that her mother is 
going to keep her father away from her.
 
Q 
Her father has been found guilty of these charges and has been sentenced to a 
lengthy prison term.  Knowing that he potentially will be incarcerated for 
a number of years, do you still have concerns about [K.M.]'s emotional health if 
she was returned home?
 
A 
Yes.
 
Q 
Okay.  What concerns are those?
 
A 
Just that she's not -- she knows she's not believed about the abuse and I think 
that she wouldn't be able to -- when kids are sexually abused, they continue 
many times to have issues concerning that throughout their lifetimes, really, 
and I don't think that -- I don't see how [Yama] could address those with her or 
help her through those or anything because she doesn't believe it ever happened 
to begin with.
 
And 
I think that's a very damaging situation to go through what [K.M.] went through, 
and you're put somewhere where you're told that that never even happened, and 
the person, the offender that molested you, is not the type of person that could 
do that, and how could you ever say that about your father?
 
I 
think living in that kind of situation would be very emotionally damaging for 
her.  It would make -- and eventually she will have, more than likely, more 
sexual abuse issues.  She already does.  She has other issues that 
she's dealing with, and I'm not sure [Yama] could be in a position to help her 
with those.
 
 
The 
therapist continued her conclusions concerning K.M.’s relationship with her 
family:
Q 
If [K.M.] knew that Juan was not coming back, do you think that her sessions 
would -- she would, I guess, lose all these fears that she has about coming back 
home?
 
A 
No, I don't think she would.
 
Q 
Why not?
 
A 
Because one of her fears surrounds the way she was treated when she made her 
outcry and not being believed and not being really supported and you're trying 
to recover from sexual victimization, not being supported in that way.  And 
I don't think those things have changed.  I don't know if she would feel 
safe that he wouldn't end up coming back anyway.
 
 
        . 
. . .
 
A 
She said that [K.M.’s sister] yelled at her and screamed at her about the 
outcry that she made about sexual abuse.
 
Q 
Okay. And if [K.M.] were returned to an environment where she was living on a 
day-to-day basis with her sister, her sisters' -- and if those attitudes 
remained, her sisters' attitudes, would that be detrimental to [K.M.]?
 
A 
Yes.
 
Q 
Is there kind of a point in time in which for the healing process or the 
recovery process of a child who is a victim of sexual abuse needs to be able to 
move on as opposed to waiting to see whether the non-perpetrating person in the 
household can come to grips with this?  I mean, can [K.M.] treat with you 
for ten years and then [Yama] says okay, I believe and that would still be a 
healthy environment?
 
A 
I think she needs to move on now.  I think it's been long enough already, 
and at this point, you'd have to question the sincerity of [Yama] believing, 
because why after all this time would that all of a sudden happen, you know?
 
Q 
And further, would you agree that [Yama] and [K.M.’s sister] and the other 
family members, their failure to believe [K.M.]'s outcry and I guess their going 
a step further and telling her that she's lied about it or created some trouble, 
does that just kind of further emotional damage to [K.M.]?
 
A 
Yes.
 
        Our 
review of the evidence shows that Yama has repeatedly, frequently, and 
consistently stated that she believes K.M. is lying about the sexual abuse 
allegations.  Yama made her viewpoint clear to the occupants of her 
household and they also believe K.M. is lying.  Yama feels that the 
problems between herself and Juan are all a result of K.M.’s lies.  
Notwithstanding many attempts by a psychologist, a caseworker, and a therapist 
to help Yama accept the veracity of K.M.’s allegations so that Yama could 
assist K.M. in getting through this time of crisis, and despite Juan’s having 
pled guilty to these three felony offenses, Yama continues to deny that her 
daughter’s allegations are true.  K.M. is acutely aware that Yama does 
not believe her allegations and that Yama thinks she is lying about what Juan 
did to her. The evidence established that by her conduct in continuing to 
disbelieve K.M.’s allegations, Yama is unable to provide a safe and stable 
environment for K.M.
        Applying 
the appropriate standards of review, we find that there is factually sufficient 
evidence to support termination of Yama’s parental rights based upon the 
grounds listed in section 161.001(1)(E), that Yama knowingly engaged in conduct 
which endangered K.M.’s physical or emotional well-being.[12] 
We overrule Yama’s fifth issue.
Additional 
grounds for termination
        If 
multiple conduct grounds are alleged for termination, the evidence is factually 
sufficient if it supports just one of the alleged conduct grounds.  In 
re W.J.H., 111 S.W.3d 707, 715 (Tex. App.—Fort Worth 2003, pet. denied).  
Therefore, we are not required to address whether the evidence is sufficient to 
establish termination under section 161.001(1)(D).  We overrule Yama’s 
fourth issue.
        In 
her sixth and seventh issues Yama asserts the evidence is factually insufficient 
to show that she executed an unrevoked or irrevocable affidavit of 
relinquishment[13] or that she constructively 
abandoned K.M.[14]   Because we have found 
the evidence sufficient to support termination under section 161.001(1)(E), we 
are not required to address whether the evidence is sufficient to establish 
termination pursuant to these two alternative grounds for termination.  See 
W.J.H., 111 S.W.3d at 715.  Additionally, we note that these grounds 
are not listed in the trial court’s judgment, although they were listed in 
TPDRS’s petition.  However, because TDPRS agrees that no evidence of 
either of these grounds was introduced at trial and that the termination 
judgment cannot be affirmed on these grounds, we sustain Yama’s sixth and 
seventh issues.
Best Interest 
Findings
        Both 
Juan and Yama challenge the factual sufficiency of the trial court’s findings 
that it is in the best interest of K.M. to terminate their parental rights.
        Nonexclusive 
factors that the trier of fact in a termination case may use in determining the 
best interest of the child include:  the desires of the child; the emotional 
and physical needs of the child now and in the future; the emotional and 
physical danger to the child now and in the future; the parental abilities of 
the individuals seeking custody; the programs available to assist these 
individuals to promote the best interest of the child; the plans for the child 
by these individuals or by the agency seeking custody; the stability of the home 
or proposed placement; the acts or omissions of the parent which may indicate 
that the existing parent-child relationship is not a proper one; and any excuse 
for the acts or omissions of the parent. Holley v. Adams, 544 
S.W.2d 367, 371-72 (Tex. 1976). These factors are not 
exhaustive; some listed factors may be inapplicable to some cases; other factors 
not on the list may also be considered when appropriate. C.H., 
89 S.W.3d at 27.
        All 
of the evidence previously recited is relevant to our review of the best 
interest determination made by the trial court. Additionally, although Yama 
participated in the programs and counseling required by CPS, her attitude toward 
K.M. and the allegations K.M. made about Juan remains unchanged. As a result, K.M.’s 
therapist and caseworker both testified that there exists a danger to K.M. that 
she will be unable to report any further abuse to her family given their 
stubborn and vocal refusal to believe her. As K.M.’s therapist 
explained, this sets K.M. up to be in a high risk situation where she has no 
support and really no protection. K.M.’s 
caseworker opined that it was CPS’s viewpoint that it was best for K.M. to be 
adopted and K.M. agreed and has voiced her desire to be adopted.
        Having 
thoroughly reviewed the evidence, we hold the evidence is factually sufficient 
to support the trial court’s findings that termination of Juan’s and 
Yama’s parental rights is in the best interest of K.M. We overrule 
Appellants’ first and second issues.
Yama’s Motion 
For Temporary Orders
        In 
her third issue, Yama contends the trial court erred by denying her motion for 
temporary orders regarding visitation pending appeal. Section 109.001 of the 
family code authorizes the trial court, within 30 days after an appeal is 
perfected, to make temporary orders to be effective during the pendency of an 
appeal. Tex. Fam. Code Ann. § 109.001 (Vernon 
2002). However, subsection (d) 
provides that the court may not suspend the operation of a judgment terminating 
the parent-child relationship. Id. 
§ 109.001(d).
        At 
a post-judgment hearing on Yama’s motion for temporary orders, the trial court 
found it was not authorized to suspend the operation of the termination 
judgment, but that if the court did have such authority to grant visitation 
pending appeal it would not do so because it would not be in K.M.’s best 
interest.[15]
        The 
hearing on Yama’s motion for temporary orders, and the trial court’s denial, 
was within the time permitted by section 109.001(a). Yama argues 
that granting visitation to her during the pendency of the appeal is not 
prohibited by section 109.001(d) because it would not suspend the operation of 
the judgment terminating her parent-child relationship with K.M., see id., 
but would simply be in addition to the judgment being appealed.
        The 
State responds that the complained of ruling is not properly before this court 
because section 109.001(c) provides that “A temporary order rendered under 
this section is not subject to interlocutory appeal.”  Id. 
§ 109.001(c). Yama counters 
with the argument that she is not seeking to appeal from an interlocutory order, 
but from a final judgment terminating her parental rights which also includes 
the trial court’s denial of her motion for post-judgment orders.
        A 
temporary order under section 109.001 is only appropriate if a final judgment 
has been signed and a notice of appeal has been filed. See id. § 
109.001(a). This statute specifically 
prohibits an appeal from any temporary order rendered under this section. See id. § 
109.001(c). Therefore, we hold we lack 
jurisdiction over Yama’s complaint regarding the denial of her request for 
temporary orders pending appeal. See In re Gonzalez, 
993 S.W.2d 147, 162 (Tex. App.—San Antonio 1999, no pet.) (holding challenge 
to temporary orders entered under section 109.001(a) is not proper subject for 
appeal, and mandamus is proper remedy); Johnson v. Johnson, 948 S.W.2d 
835, 838 (Tex. App.—San Antonio 1997, writ denied) (holding award of 
attorney’s fees under section 109.001(a) is not subject to appeal and mandamus 
is proper remedy). We dismiss 
Yama’s third issue for want of jurisdiction.
Conclusion
        We 
affirm the trial court’s judgment terminating the parental rights of Juan M. 
and Yama H. in the minor child K.M.
  
  
                                                                           PER 
CURIAM
  
  
   
PANEL 
F:   HOLMAN, J.; CAYCE, C.J.; and LIVINGSTON, J.
 
DELIVERED: 
November 12, 2004

 
NOTES
1.  
See Tex. R. App. P. 47.4.
2.  
To protect the privacy of the parties involved in this appeal, we identify the 
child by initials only and the appellants by first names only.  See Tex. Fam. Code Ann. § 109.002(d) 
(Vernon 2002).
3.  
Effective February 1, 2004, the name of the agency changed to the Texas 
Department of Family and Protective Services.  However, for the sake of 
consistency in this case, we will continue to use TDPRS when we refer to the 
agency.
4.  
The use of the term “vagina” was Dula’s word; she testified that K.M. 
“had no identifying name for the vagina” but used anatomically correct dolls 
to show Dula what Juan had done.
5.  
Dula videotaped her interview with K.M. but the tape was not viewed by the trial 
court or offered into evidence; therefore, it is not a part of the appellate 
record. K.M. did not 
testify at trial and the judge exercised her discretion not to conduct an ex 
parte interview with K.M.
6.  
Juan’s convictions were affirmed on appeal and mandate has issued.  In 
our continuing effort to protect the privacy of the parties in the current suit, 
we will refrain from listing the citation to the criminal case.
7.  
See id. § 161.001(1)(D), (E).
8.  
See id. § 161.001(1)(L).
9.  
See id. § 161.001(1)(Q).
10.  
See id. § 161.001(2).
11.  
Yama complied with the terms of CPS’s safety plan except in two instances.  
On one occasion, Yama permitted Juan to come over to the house (after he was 
released on bond) to pick up his clothes, but Yama had K.M. stay upstairs so she 
wouldn’t have any contact with Juan.  Yama’s caseworker acknowledged 
that she had told Yama that Juan needed his clothes and it is possible that Yama 
misunderstood the meaning of what contact was permitted.  There was also 
one occasion when Yama was talking on the telephone with Juan who had called 
from jail, and Yama agreed with K.M.’s request to speak with her father.
12.  
See also In re W.L., No. 05-00-02023-CV, 2002 WL 312493, at *3 
(Tex. App.—Dallas Feb. 28, 2002, no pet.) (not designated for publication) 
(holding evidence sufficient to support violation of section 161.001(1)(E) where 
mother did not believe father fondled their five-year-old girl and mother stated 
she did not believe she needed to protect her other daughters from the father).
13.  
See Tex. Fam. Code Ann. § 
161.001(1)(K).
14.  
See id. § 161.001(1)(N).
15.  
This ruling is not contained in a written order but is set out in the 
reporter’s record from the hearing; additionally, the court’s docket sheet 
reflects that the motion for temporary orders was denied.