IN RE E.R.

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-117-CV

IN THE INTEREST OF 

E.R., A CHILD 

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Introduction

Appellant, April R., appeals the trial court’s order terminating her parental rights to her child, E.R.  In five points, appellant complains that (1) there was no evidence or insufficient evidence to support the jury’s finding that appellant engaged in conduct or knowingly placed E.R. with persons who engaged in conduct that endangered E.R., (2) there was no evidence or insufficient evidence to support the jury’s finding that appellant knowingly placed or knowingly allowed E.R. to remain in conditions or surroundings that endangered E.R., (3) there was insufficient evidence to support the jury’s finding that termination was in E.R.’s best interest, (4) the trial court erred in denying appellant’s motion for a separate trial, and (5) the trial court erred in admitting exhibits that were not timely produced in response to appellant’s discovery motion.  We affirm.  

Facts

E.R. was born premature in Birmingham, Alabama.  At birth, she was twelve and a half inches long and weighed one pound five ounces.  She is the child of appellant and Robert R.  E.R. was hospitalized for three months because of various complications resulting from her premature birth.  After E.R. was discharged from the hospital, appellant and Robert R. moved in with Robert R.’s mother, Joyce, in Alabama.  Joyce and appellant disagreed over how to care for E.R.  Joyce believed that appellant did not change or bathe E.R. as often as she should have.  Joyce testified that E.R. would be dirty and smelly with “dirt up underneath her fingernails” and “rings around her neck” and that appellant would let E.R. sit in her own urine and feces without changing her diaper.   Also, Joyce felt that appellant should hold and cuddle E.R. when feeding her instead of laying her on the couch with a bottle propped up by a blanket. 

Approximately two weeks after moving in with Joyce, Robert R. left with  E.R. and appellant in his truck to go to Florida.  From Florida they traveled to New York by bus.  Robert R. testified that they were gone for three or four weeks and that during their time on the road, he and appellant were unable to provide E.R. with any follow-up medical care. 

Shortly after returning to Alabama, appellant, Robert R., and E.R. moved into a motel near Joyce’s house, and Robert R. returned to work as a longhaul truck driver.  Joyce often visited appellant, taking appellant and E.R. to E.R.’s doctor appointments and sometimes taking E.R. back to her house for visits.   Joyce testified that when she arrived for one of these visits, appellant’s room smelled of marijuana smoke.  On another visit, Joyce discovered a strange man in the motel room with appellant playing video games while E.R. sat in her swing soaked in her own urine.  Joyce also testified that appellant did not appear to be feeding E.R. adequately.  Joyce noticed that the empty baby food jars on appellant’s counter hardly ever changed and that E.R. was always hungry when she visited Joyce. 

Appellant, Robert R., and E.R. moved to Texas in spring 2002.  They lived in the Budget Suites in Dallas.  Robert R.’s father (Mike), stepmother, and two half siblings, Vanessa and David, also lived in the complex.  Appellant started working at the Santa Fe Cabaret in Dallas as a topless dancer.  

Both Vanessa and David testified to seeing appellant shake E.R. when she would not stop crying.  The children and their father, Mike, testified that they saw appellant push E.R.’s head down to make her go to bed.  David testified that he saw appellant slam E.R. to the floor in an attempt to quiet her.  In addition to bruising on E.R., both children testified to seeing a “footprint” on her back.  Mike testified that he once saw E.R. unsupervised on the third floor of the motel near some stairs.  He testified that his son David had to grab E.R. and put her back in appellant’s room.  Mike also testified to seeing bruising on E.R.   Appellant took E.R. and left Robert R. in summer 2002.  Appellant testified that they were “[d]isagreeing with each other . . . sexually.”  After staying with friends for a while, appellant moved in with Tom Williams, a cab driver who drove her to and from the Santa Fe Cabaret.
(footnote: 2)  In September 2002, Child Protective Services (CPS) received two referrals regarding E.R.  Crystal Clay, the CPS investigator, visited the Euless apartment in which Tom Williams, appellant, and E.R. were living on September 17 and on October 3, 2002, but did not see anything out of the ordinary.  

Appellant testified that on the night of October 25 (early morning of October 26), 2002, Tom Williams picked her up at work with E.R. in his car.   Tom told her that E.R. had been injured when he fell on her as he was sitting in a chair trying to remove his boots.  When appellant got in the car, she noticed that E.R. was having difficulty breathing.  Instead of taking E.R. to a hospital in Dallas, appellant and Tom decided to take E.R. to Cook Children’s Hospital in Fort Worth because it was closer to their apartment in Euless.  The emergency room physician testified that appellant and Tom Williams smelled strongly of alcohol. 

 The emergency room physician noticed that E.R. had multiple bruises, some of which were older than others.  Appellant testified that bruises on E.R.’s ear were the result of a bite from Tom Williams’s dog.  However, the radiologist testified that because there were no teeth marks and because the pattern of the bruise was not compatible with a bite, the bruising on E.R.’s ear likely resulted from a fall or a hit. 

The doctors performed a CAT scan on E.R. and discovered that she had a lacerated liver, which was bleeding into her abdominal cavity.  X rays revealed multiple broken ribs as well as twisting or shaking injuries to E.R.’s wrist and femur.  E.R. had also sustained a “subarachnoid hemorrhage” injury to her brain.  The doctors concluded that E.R.’s injuries had occurred on several different occasions and had been intentionally inflicted.  The neurologist testified that appellant told him that E.R. was injured when Tom Williams fell on her when he was removing his boots.  He testified that this explanation did not coincide with E.R.’s injuries.  Tom Williams was later arrested and charged with injury to a child.
(footnote: 3) 

On October 28, 2002, the Texas Department of Protective and Regulatory Services (DFPS) filed a petition to terminate the parental rights of appellant and Robert R. to E.R.  E.R. was removed from appellant’s custody and placed in foster care.  After E.R.’s removal, appellant participated in the service plan developed by CPS.  Appellant attended parenting and anger management classes.  She also attended counseling sessions.  She got engaged to and moved in with Carl Shiveley.  She quit working as a topless dancer and was working at McDonald’s at the time of the trial.  In addition, she tested negative on several random drug tests administered to her. 

On January 22, 2004, William and Mary Kathleen (Kathy) Beckham, appellees and E.R.’s foster parents, filed a petition to intervene and to terminate appellant’s and Robert R.’s parental rights.  Appellees planned to adopt E.R.   The termination case went to trial on February 23, 2004.  A jury found that (1) appellant knowingly placed or knowingly allowed E.R. to remain in conditions or surroundings which endangered the physical or emotional well-being of E.R., (2) appellant engaged in conduct or knowingly placed E.R. with persons who engaged in conduct which endangered the physical or emotional well-being of E.R., and (3) the termination of the parent-child relationship between appellant and E.R. would be in E.R.’s best interest.  The trial court entered an order terminating appellant’s and Robert R.’s parental rights.   

Conduct

In her first point, appellant argues that there was no evidence or insufficient evidence to support the jury’s finding that she engaged in conduct or knowingly placed E.R. with persons who engaged in conduct that endangered E.R.   
A parent’s rights to “the companionship, care, custody, and management” of his or her children are constitutional interests “far more precious than any property right.”  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982).  
“While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.”  
In re C.H.
, 89 S.W.3d 17, 26 (Tex. 2002).
  
In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit. 
 T
EX
. F
AM
. C
ODE
 A
NN
. § 161.206(b) (Vernon Supp. 2004-05); 
Holick v. Smith
, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  
Holick,
 685 S.W.2d at 20-21;
 In re D.T.
, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  T
EX.
 F
AM.
 C
ODE
 A
NN.
 § 161.001 (Vernon 2002); 
Richardson v. Green
, 677 S.W.2d 497, 499 (Tex. 1984); 
Swate v. Swate
, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  T
EX
. F
AM
. C
ODE
 A
NN
. §§ 161.001, 161.206(a); 
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.  
G.M.
, 596 S.W.2d at 847; 
D.T.
, 34 S.W.3d at 630.  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”  
Tex. Fam. Code Ann.
 § 101.007 (Vernon 2002).  

Legal Sufficiency

The higher burden of proof in termination cases alters the appellate standard of legal sufficiency review.  
In re J.F.C.
, 96 S.W.3d 256, 265 (Tex. 2002).  The traditional no-evidence standard does not adequately protect the parent’s constitutional interests.  
Id. 
 In reviewing the evidence for legal sufficiency in parental termination cases, we must determine “whether the evidence is such that a factfinder could reasonably form a firm belief or conviction” that the grounds for termination were proven.  
Id
. at 265-66.  We must review all the evidence in the light most favorable to the finding and judgment.  
Id.
 at 266.  This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so.  
Id.
  We must also disregard all evidence that a reasonable factfinder could have disbelieved.  
Id.
  We must consider, however, undisputed evidence even if it does not support the finding.  
Id.
  
If we determine that no reasonable factfinder could form a firm belief or conviction that the grounds for termination were proven, then the evidence is legally insufficient, and we must render judgment for the parent
.  
Id.

Factual Sufficiency
 

The higher burden of proof in termination cases
 
also alters the appellate standard of factual sufficiency review.  
C.H.
, 89 S.W.3d at 25.  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”  
Id
.  In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine “whether the evidence is such that a factfinder could reasonably form a firm belief or conviction” that the grounds for termination were proven.  
Id
.  Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent’s parental rights would be in the best interest of the child.  
Id
. at 28. 

Analysis

Here, there is evidence that appellant had physically abused E.R.  
See In re S.H.A
., 728 S.W.2d 73, 83 (Tex. App.སྭDallas 1987, writ ref’d n.r.e.).   Vanessa and David testified to seeing appellant physically abuse E.R., and both the children and their father testified to seeing bruises on E.R. while appellant and Robert R. were living at the Budget Suites in Dallas.  

Also, there is evidence that appellant knew that Tom Williams had been physically abusive toward E.R. before the October 26, 2002 incident.  Appellant admitted seeing bruises on E.R. before October 26.  In a statement to the district attorney’s office, appellant said that during the second month of living with Tom Williams, she had noticed his becoming more aggressive toward E.R.  In the same statement, appellant said that when Tom Williams picked her up from work on October 26 and told her that E.R. was having trouble breathing, she asked him “What the f*** did you do to her this time?” 

Based on our review of the entire record, we conclude that a factfinder could reasonably form a belief or conviction that appellant engaged in conduct or knowingly placed E.R. with persons who engaged in conduct that endangered the physical or emotional well-being of E.R., and therefore, we hold that the evidence is legally and factually sufficient to support the jury’s finding.  We overrule appellant’s first point.  Because a petitioner need establish only one of the acts or omissions enumerated under subdivision (1) of section 161.001, we need not address appellant’s second point and can instead 
move directly to appellant’s third point.  
See 
T
EX.
 F
AM.
 C
ODE
 A
NN.
 § 161.001. 

Best Interest

In her third point, appellant argues that there was insufficient evidence to support the jury’s finding that termination was in E.R.’s best interest.  Appellant argues that there was no evidence that she failed to adequately feed, house, or secure basic medical care for E.R.  She points to the fact that she worked hard on her service plan, attended parenting and anger control classes, and participated in counseling.  She also notes that she passed all her random drug tests.    

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include

(1) the desires of the child,

(2) the emotional and physical needs of the child now and in the future, 

(3) the emotional and physical danger to the child now and in the future, 

(4) the parental abilities of the individuals seeking custody,

(5) the programs available to assist these individuals to promote the best interest of the child,

(6) the plans for the child by these individuals or by the agency seeking custody, 

(7) the stability of the home or proposed placement,

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and 

(9) any excuse for the acts or omissions of the parent. 

Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).  These factors are not exhaustive.  Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C.H
., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children.  
Id.
  On the other hand, the presence of scant evidence relevant to each 
Holley
 factor will not support such a finding.  
Id.

The Emotional and Physical Needs of E.R. Now and in the Future

E.R. has various medical conditions including asthma, acid reflux, hydrocephalus, and brain damage.  Also, Dr. Warren Marks, E.R.’s pediatric neurologist, testified that E.R. has developmental problems that will likely continue in the future.  He testified that because of these problems, E.R. would need a nurturing parent who was committed to providing E.R. with resources, including special services.  E.R. has shown behavior evidencing emotional problems.  Appellee Kathy Beckham testified that E.R. would “come unglued” when appellees would wrestle with their children.  Kathy Beckham also testified that when her other children spilled something, E.R. would get down with her hands underneath her, put her head down and wail because she was afraid someone was coming after her. 

The Emotional and Physical Danger to E.R. Now and in the Future

There is evidence that appellant physically abused E.R.  Moreover, appellant has shown an inability to protect E.R. from physical danger.  Appellant testified that Tom Williams did not have unsupervised contact with E.R. before the middle of October 2002, and yet the radiologist testified that some of E.R.’s rib fractures were six weeks to three or four months old.  Genie Long, a CPS caseworker, testified that despite the fact that appellant has worked hard on her service plan, she recommends that appellant’s parental rights be terminated.  She testified that because she does not know who was responsible for all of E.R.’s injuries, the risk of returning E.R. to appellant has not been reduced.  

During and after the October 26 incident, appellant displayed a general lack of concern regarding the seriousness of E.R.’s injuries and who was responsible for them.  Instead of taking E.R. to the nearest hospital when she was seriously injured on October 26, appellant took E.R. to a hospital in Fort Worth because it was more conveniently located in relation to her home.  During trial, appellant seemed to accept that Tom Williams injured E.R., yet on appeal, she says the identity of the person who injured E.R. is unknown.

Crystal Clay testified that on October 26, appellant told her that she had previously seen bruises on E.R. and that she had asked for an explanation from Tom Williams but that he could not give her one.  This concerned Clay because E.R. was not ambulatory.  Genie Long testified that at the temporary order hearings 
in October and December 2002, appellant giggled when shown pictures of E.R.’s injuries taken at the hospital.  She testified that appellant then denied ever seeing the injuries on E.R. 

Appellee Kathy Beckham testified that she once asked appellant whether she felt bad about what happened to E.R., to which appellant responded, “[N]o, not really, because I didn’t know and I wasn’t there and [E.R.] didn’t change, I had no way of knowing, and I don’t feel bad about something I don’t know about.”  Detective Skiles, who was investigating the October 26 incident, testified that after speaking with appellant, he had the impression that appellant knew that E.R. had been injured previously and that considering the numerous bruises on E.R., he did not see how appellant could not have known. 

Appellant was not cooperative with the investigation into E.R.’s injuries.  Detective Skiles testified that he had made numerous attempts to contact appellant, leaving his business card and asking appellant to call him, but that appellant never called him back.  When asked at trial why she did not tell CPS the names of all of E.R.’s caregivers, appellant responded that “it was none of their business.” 

Appellant has lived with a number of different men.  Before marrying Robert R., she lived with Mark Anderson, Chuck Windsor, and somebody named Dooger.  After she left Robert R., she lived with friends before moving in with Tom Williams.  She lived with Mickey and Daniel Pokorski after CPS took custody of E.R.  At the time of the trial, she was living with Carl Shiveley and was planning to marry him.

Mary Dale Headrick, the CPS visitation supervisor, testified that during appellant’s visits with E.R., E.R. did not appear to be afraid of appellant and that appellant and E.R. seemed to love each other.  She testified that appellant and E.R. appeared to be bonded to one another.  She also testified that E.R. interacted well with appellant’s boyfriend Carl Shiveley. 

However, Kathy Beckham testified that at E.R.’s specialist appointments, E.R. would refuse to interact with appellant.  Moreover, E.R. made two visits to an audiologist during which she was left in a soundproof booth with appellant.  Both times, E.R. became upset and started screaming when she realized that she was alone with appellant, and she 
did not calm down until someone else came into the room.  Kathy Beckham testified that it was extremely uncommon for appellant and E.R. to play together and that E.R. did not want to participate.  She also testified that E.R. would throw tantrums before going on visits to see appellant. 

Parental Abilities of Individuals Seeking Custody

As E.R.’s foster parents, appellees have attended to E.R.’s medical and developmental needs.  During the sixteen months in which they cared for her, appellees took E.R. to numerous specialist appointments, including visits to an audiologist, speech pathologist, nutritionalist, and a neurologist.  Appellees have gotten E.R. involved in Early Childhood Intervention (ECI).  The ECI worker testified that E.R. has made progress while staying with appellees and that appellees are meeting E.R.’s needs.  Appellees plan to adopt E.R.  Appellees have adopted two other children who were placed in their foster care after being removed from the biological mother’s custody. 

Genie Long testified that E.R. appears to have bonded with appellees.  She testified that E.R. runs to appellees for comfort and that she talks, laughs, and plays with them.  Long also testified that E.R. interacts with her foster siblings.  She testified that E.R. would play and sometimes fuss with the children just like siblings would. 

Acts or Omissions Indicating the Existing Parent/Child Relationship is not  Proper.

There is evidence that appellant failed to attend to E.R.’s basic needs by not bathing her and changing her diaper.  Further, contrary to appellant’s arguments, there is evidence that appellant failed to adequately feed E.R. and provide her with basic medical care.  Sharon Johnson, a dietician who worked for ECI, testified that E.R. was not receiving adequate nutrition while she was living with appellant, as evidenced by E.R.’s unusually rapid growth rate and eating behavior after she went to live with appellees.  Robert R.’s mother, Joyce, testified that she was concerned that appellant was not feeding E.R. adequately.  The emergency room physician described E.R. as a “scrawny child.”  Appellee Kathy Beckham testified that when being fed, E.R. would lean forward for more food while vomiting. 

Despite E.R.’s special medical problems, appellant and Robert R. took her out on the road for almost a month, only two weeks after E.R. had been released from the hospital.  Crystal Clay testified that after reviewing the records from E.R.’s pediatrician in Alabama, she was concerned that appellant and Robert R. had not kept E.R. on an apnea monitor and that E.R. had missed several RSV vaccinations that she needed.  Caseworker Angela Gillock testified that appellant continued to smoke throughout the pendency of the case despite Angela’s expressing to appellant her concerns about the effects of cigarette smoke on E.R.’s asthma. 

Kathy Beckham testified that after the October 26 incident, when E.R. was in her care, she attempted to obtain E.R.’s medical history from appellant.  She testified that appellant was oblivious of E.R.’s previous medical needs and “not really interested.” 

Based on our review of the entire record, we hold that the evidence was factually sufficient to support the trial court’s finding that termination was in E.R.’s best interest.  We overrule appellant’s third point.  

Separate Trial

In her fourth point, appellant argues that the trial court erred in denying her motion for a separate trial.
(footnote: 4)  Appellant complains that while Robert R. publicly proclaimed his intention to contest termination of his parental rights, he actually had no intention of contesting the case and wanted appellees to have custody of E.R.  Further, appellant argues that Robert R. intended to sabotage her right to a fair and impartial jury trial.    

Specifically, appellant points to an email that Robert R. sent to her less than two weeks before the trial, on February 12, 2004, in which he said he planned to inform CPS that he felt E.R. should remain with her foster parents and that he would not be “fighting for [E.R.]” as long as he could retain his rights and be able to visit and write letters to E.R.  After receiving the email, appellant filed a motion for severance or in the alternative a motion for a separate trial, which the trial court denied.  Five days into the trial, on February 27, 2004, Robert R. filed a relinquishment of parental rights.  The trial court denied appellant’s subsequent request for a mistrial.                 

Rule 174(b) of the Texas Rules of Civil Procedure provides that a “court in furtherance of convenience or to avoid prejudice may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues.”  
Tex. R. Civ. P.
 174(b).  We review a trial court’s denial of a motion for a separate trial for abuse of discretion.  
See Womack v. Berry
, 291 S.W.2d 677, 683 (Tex. 1956).  

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable.  
See Carpenter v. Cimarron Hydrocarbons Corp.
, 98 S.W.3d 682, 687 (Tex. 2002); 
Downer v. Aquamarine Operators, Inc.
, 701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied
, 476 U.S. 1159 (1986).  Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.  
Downer
, 701 S.W.2d at 241-42.

An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence.  
Davis v. Huey
, 571 S.W.2d 859, 862 (Tex. 1978); 
see also Goode v. Shoukfeh
, 943 S.W.2d 441, 446 (Tex. 1997).  Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court’s decision.  
Butnaru v. Ford Motor Co.
, 84 S.W.3d 198, 211 (Tex. 2002); 
Holley v. Holley
, 864 S.W.2d 703, 706 (Tex. App.—Houston [1st
 Dist.] 1993, writ denied).

While a trial court has broad discretion in deciding whether to grant a motion for separate trial, this discretion is not unlimited.  
U.S. Fire Ins. Co. v. Millard
, 847 S.W.2d 668, 671 (Tex. App.སྭHouston [1st Dist.] 1993, no writ).   When all of the facts and circumstances of the case unquestionably require a separate trial to prevent manifest injustice, and there is no fact or circumstance supporting or tending to support a contrary conclusion, and the legal rights of the parties will not be prejudiced thereby, there is no room for the exercise of discretion.

Womack
, 291 S.W.2d at 683.  

Here, we are unable to conclude that the facts and circumstances of the case unquestionably required a separate trial to prevent manifest injustice.  Appellant does not say exactly how Robert R. intended to sabotage her case.  She does not argue that she was unable to equalize jury strikes or that certain evidence was admitted that would not have been admitted had a separate trial been granted.  Moreover, Robert R.’s e-mail does not show that his interests were so different from appellant’s that a separate trial was required.  The e-mail shows that while Robert R. did not intend to seek custody of E.R., he did not want his parental rights terminated.  Therefore, we hold that the trial court did not abuse its discretion in denying appellant’s motion for a separate trial.  We overrule appellant’s fourth point.   
   

Discovery

In her fifth point, appellant argues that the trial court erred in admitting exhibits that were not timely produced in response to appellant’s discovery motion.  Appellant cites rule 193.6 of the Texas Rules of Civil Procedure, which provides as follows:

A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed . . . unless the court finds that:

(1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or

(2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

  

Tex. R. Civ. P.
 193.6(a).  

On December 19, 2003, appellant sent DFPS a request for production, which included, among other things, (1) all drawings, graphics, charts, photographs, tape or electronic recordings and audio/video recordings that constitute matters relevant to the subject matter of this lawsuit, and (2) all records, including invoices relating to medical, psychological, and psychiatric treatments, consultations, or diagnoses of the parties and child, including but not limited to any prescriptions.  Appellant argues that DFPS had several items in its possession that were covered by the request for production but were not timely produced.  Specifically, appellant complains about the admission of pictures taken of E.R. at the hospital, as well as the X rays and CAT scans of E.R.’s injuries.  Appellant did not object when the pictures taken of E.R. in the hospital were offered at trial.  Therefore, any complaint regarding the pictures is waived.  
See 
Tex
. R. App. P.
 33.1(a);
 
Tex. R. Evid.
 103(a)(1).  But appellant did object when the X rays and CAT scans of E.R.’s injuries were offered.    

We need not address whether the trial court erred in admitting these exhibits because we hold that any error would be harmless.  As noted by appellees, appellant did not request discovery from them.  Therefore, there is nothing to suggest that appellees would not have been able to admit the exhibits had DFPS been prohibited under Rule 193.6 from doing so.  
See 
Tex. R. Civ. P.
 193.6(a); 
Brook v. Brook
, 865 S.W.2d 166, 172 (Tex. App.སྭCorpus Christi 1993), 
aff’d
, 881 S.W.2d 297 (Tex. 1994).  Furthermore, appellees made an offer of proof at trial that they would have called the radiologist to testify and would have offered the same exhibits had the state not done so.   Appellees stated that discovery had not been propounded to them.  Finally, the exhibits were merely cumulative of the properly admitted testimony from the radiologist regarding E.R.’s injuries.  
See Gee v. Liberty Mut. Fire Ins. Co.
, 765 S.W.2d 394, 396 (Tex. 1989) (holiding that error in admitting evidence is harmless if merely cumulative of properly admitted evidence); 
In re W.J.H.
, 111 S.W.3d 707, 714 (Tex. App.སྭFort Worth 2003, pet. denied) (same).  We overrule appellant’s fifth point.

Conclusion
  

Having overruled all of appellant’s points, we affirm the trial court’s judgment.   

PER CURIAM

PANEL F: LIVINGSTON, WALKER, and MCCOY, JJ.

DELIVERED:  February 10, 2005

FOOTNOTES
1:
See
 
Tex. R. App. P
. 47.4.

2:
It is unclear exactly when appellant began living with Tom Williams.   

3:
Although appellant was not arrested, Detective Charles T. Skiles testified at trial that, in light of recently received information from the district attorney’s office, he had reopened the investigation regarding appellant and was considering preparing an arrest warrant for her. 

4:
At trial, appellant made a motion for severance or in the alternative a separate trial.  However, on appeal, appellant argues only the separate trial issue.