IN THE INTEREST OF W.J.H. JR., J.J.H., D.D.H., AND D.N.H., CHILDREN

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-02-343-CV

IN THE INTEREST OF W.J.H., JR., 

J.J.H., D.D.H., AND D.N.H.,

CHILDREN 

------------

FROM THE 323
RD
 DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

Answering three special issues after trial, a jury found that (1) Appellant Evelyn D. knowingly placed or knowingly allowed W.J.H. Jr., J.J.H., D.D.H., and D.N.H. (“the children”) to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) Evelyn engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children’s physical or emotional well-being; and (3) termination of the parent-child relationship would be in the children’s best interest.
(footnote: 1)  Based on the verdict, the trial court entered a judgment terminating Evelyn’s parental rights over the children.  We affirm the trial court’s judgment.

Jury Charge

In her first point, Evelyn contends that “the trial court erred by including questions in the court’s charge to the jury that applied to the four children collectively, and by failing to submit a separate set of questions for each individual child.”  In other words, Evelyn contends that the three special issues submitted to the jury should have been submitted separately for each child.  Evelyn also points out in a footnote in her brief that the charge violated the broad-form submission requirement.  We hold that the trial court erred by failing to submit to the jury a separate broad-form question regarding the termination of Evelyn’s parental rights to each child.
(footnote: 2)  That is, the jury should have been asked to separately determine whether the parent-child relationship between Evelyn and W.J.H., Jr. should be terminated, whether the parent-child relationship between Evelyn and J.J.H. should be terminated, whether the parent-child relationship between Evelyn and D.D.H. should be terminated, and whether the parent-child relationship between Evelyn and D.N.H. should be terminated.
(footnote: 3)  Evelyn, however, failed to preserve this error.

To preserve error in the jury charge, the complaining party must timely and plainly make the court aware of the complaint and get a ruling.
(footnote: 4)  The record does not show that Evelyn lodged any objection or request relating to the jury charge before the charge was submitted to the jury.  In fact, Evelyn did not raise this complaint until she filed her motion for new trial.  Thus, her objection was untimely.
(footnote: 5)  Additionally, Evelyn’s trial counsel appears to have participated in the drafting of the jury charge and apparently agreed with it.
(footnote: 6)  Finally, Evelyn claimed fundamental error for the first time at oral argument; in her brief on appeal, Evelyn does not allege, argue, or cite any authority for the proposition that the all-for-one submission used below amounted to fundamental error.
(footnote: 7)  For all of these reasons, we hold that Evelyn failed to preserve the error in the jury charge.  We overrule her first point.

Toxicology Results

In Evelyn’s second point, she contends that “the trial court erred by admitting in evidence the results of toxicology tests performed on the children since the sponsoring testimony did not establish the required indicia of trustworthiness.”  Appellee Texas Department of Protective and Regulatory Services (“CPS”) argues that we should not address this point because it did not appear in Evelyn’s statement of points filed in the trial court under section 263.405(b) of the Texas Family Code.
(footnote: 8)  That section provides:

Not later than the 15th day after the date a final order is signed by the trial judge, a party intending to appeal the order must file with the trial court a statement of the point or points on which the party intends to appeal.  The statement may be combined with a motion for a new trial.
(footnote: 9)  

In involuntary termination cases, we are required to strictly construe the involuntary termination statutes in favor of the parent.
(footnote: 10)  Here, the State asks us to construe section 263.405(b) 
against the parent
 and hold that the parent’s failure to present a particular point in her timely filed statement of intended points bars her from raising the point on appeal.  

In construing section 263.405(b), this court has held that the provisions in the statute requiring an appellant to file a statement of the points on which she intends to appeal are not jurisdictional.
(footnote: 11)  We have also held that “the failure to include a subject matter jurisdiction complaint in the statements of points on appeal does not deprive us of our jurisdiction to review the merits of the complaint” and that “appellants did not waive their right to complain about the trial court’s lack of subject matter jurisdiction by failing to include the [points] in their statements of points on appeal.”
(footnote: 12)  We now extend those holdings to expressly hold that a party’s failure to include a particular point or points in the statement of points filed under section 263.405(b) does not waive her right to raise such points on appeal, as long as she complies with the procedural requirement to file a statement of points and the appellee does not establish prejudice.
(footnote: 13)
 CPS asks us to analogize the 263.405(b) requirements to those of Texas Rule of Appellate Procedure 34.6(c), governing partial reporter’s records,
(footnote: 14) citing a case in which this court held that strict compliance with rule 34.6(c) is necessary to preserve points for appellate review.
(footnote: 15)  But the Texas Supreme Court has expressly rejected the idea that strict compliance with that rule is necessary absent a showing of prejudice.
(footnote: 16)  

We have previously stated that the purpose of section 263.405(b) “was to address post-judgment appellate delays, correct provisional inconsistencies, and provide a mechanism through which” the trial court can be compelled to timely set a case for trial.
(footnote: 17)  The purpose was not to constrict the appellate rights of parents.  We therefore decline to impose a death penalty sanction for failing to raise a particular point in the statement of intended points when the legislature chose not to impose such a penalty and when the appellee cannot demonstrate prejudice.  Barring an appellant from raising a point on appeal that did not appear in the statement of intended points filed in the trial court would be unfair, considering that the statement of intended points is due within fifteen days of the date the final order is signed, but the reporter’s record is not due until sixty days after the judgment is signed.
(footnote: 18)  Such a bar would also appear to insulate all trial error occurring after the fifteen-day deadline except error involved in orders denying indigence claims or finding appeals frivolous.
(footnote: 19)  That is, with such a bar in place, it appears that a litigant could no longer appeal, for example, the denial of a timely filed motion for new trial unless it was filed and ruled upon before the statement of intended points was due.  Such a result would be absurd.  

In statutory construction, we presume the legislature intended a just and reasonable result.
(footnote: 20)  We do not construe a statute in a manner that will lead to a foolish or absurd result when another alternative is available.
(footnote: 21)  We therefore hold that a point’s absence from a statement of intended points filed in the trial court does not bar our consideration of the point on appeal when an appellee does not demonstrate prejudice.  CPS has not alleged or demonstrated that it was prejudiced by the omission of this point from Evelyn’s statement of points; we shall therefore address it.

In her discussion of this point, Evelyn complains that toxicology reports showing that the children had cocaine in their systems are hearsay, that the sponsoring affidavits and the records themselves indicate a lack of trustworthiness, that there is no evidence that the tests conducted were the standard tests used to detect the presence of cocaine, that there is no evidence that the tests conducted were based on reliable scientific principles or methods, that there is no evidence that appropriate procedures were used when conducting the tests, and that there is no evidence establishing a chain of custody from the time the samples were taken until the time they were tested.  She further complains that there is no evidence that the doctor named in the reports conducted the test or was qualified to do so, nor is there evidence that the doctor had personal knowledge of the tests or test results.  Finally, she complains that the older three children were tested in anticipation of litigation, not for medical treatment.  

At trial, Evelyn objected on the basis of relevancy, authenticity, hearsay, and “improper predicate.”  Thus, most of her complaints on appeal do not comport with her objections at trial.
(footnote: 22)  Only the hearsay objection was made at trial and on appeal.  We need not address whether the trial court erred in overruling Evelyn’s hearsay objection, however, because error in admitting evidence is generally harmless if the contested evidence is merely cumulative of properly admitted evidence.
(footnote: 23)  Evidence that all four children had cocaine in their systems came in without objection at other points in the trial.  Thus, even if the trial court did err by admitting the reports, such error was harmless.  Consequently, we overrule Evelyn’s second point. 

Factual Sufficiency

In her third point, Evelyn contends that the evidence is factually insufficient to support the jury’s three findings.  We hold that the evidence is factually sufficient to support the jury’s findings.

Standard of Review

A parent’s rights to “the companionship, care, custody and management” of his or her children are constitutional interests “far more precious than any property right.”
(footnote: 24)  But these rights are not absolute.  “Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve” the parental rights.
(footnote: 25)  In a termination case, the State seeks to end parental rights permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit.
(footnote: 26)  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.
(footnote: 27)
 In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.
(footnote: 28)  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.
(footnote: 29)
 Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by “clear and convincing evidence.”
(footnote: 30)  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.
(footnote: 31)  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”
(footnote: 32)
 The higher burden of proof in termination cases alters the appellate standard of factual sufficiency review.
(footnote: 33)  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”
(footnote: 34)  In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine “whether the evidence is such that a factfinder could reasonably form a firm belief or conviction” that the grounds for termination were proven.
(footnote: 35)  Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent’s parental rights would be in the best interest of the child.
(footnote: 36) 
 If multiple conduct grounds are alleged for termination, the evidence is factually sufficient if it factually supports just one of the alleged conduct grounds.
(footnote: 37) 

Endangerment

The petition for termination alleged and the jury found that Evelyn knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children’s physical or emotional well-being.
(footnote: 38)  Endangerment means to expose to loss or injury, to jeopardize.
(footnote: 39)  It can occur through both acts and omissions.
(footnote: 40)  Neglect can be just as dangerous to the child’s emotional and physical health as intentional abuse.
(footnote: 41)  

Under subsection D, evidence must show that the child’s environment is a source of endangerment.
(footnote: 42)  In some circumstances, the parent’s conduct may create that dangerous environment.
(footnote: 43)  Subsection E focuses on the parent’s conduct alone, including acts and omissions.
(footnote: 44)  While the endangerment must be a direct result of the parent’s course of conduct, the conduct does not have to be directed toward the child, nor does the child have to suffer actual injury for the finding to be upheld.
(footnote: 45)  Similarly, the conduct does not have to cause a concrete threat of injury to the child.
(footnote: 46)  If the evidence shows that the parent has engaged in a course of conduct which has the effect of endangering the child, then the finding under subsection E may be upheld.
(footnote: 47)  

Finally, a parent’s actions or inactions that endanger the other parent or another child can sufficiently support the termination of parental rights to the child before the court.
(footnote: 48)  While the child’s presence during the parent’s violent or neglectful conduct directed at the other parent or siblings is evidence of his endangerment, his presence is not necessary for the endangerment finding to be upheld.
(footnote: 49)  If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct.
(footnote: 50)  

CPS received a complaint in September 2000 that the third child, D.D.H., the youngest at the time, was very dirty and that J.J.H., who was around two at the time, could not walk or talk.  Within a week, another complaint alleged that the family’s house was condemned, that there was no running water, and that the children were asking neighbors for food and water.  The complaint alleged that the children wore the same clothes for weeks at a time and that they stank.  Allegedly, the parents were at home all day.  When CPS investigated the two complaints at what appeared to be a one-bedroom home on East Mulkey, W.J.H., Sr. told the investigator that Evelyn and the children were at her mother’s home.  The investigator understood that they were only away for the day.  The investigator observed that the electricity was off, there was no running water, wires were exposed, there were holes in the ceiling, the floor was rotting, and car parts were on the floor, accessible to the children.  Lots of bottles, some empty, some closed, some turned over, were also on the floor.  The house was dirty, and garbage, clothes, and old food were all over the kitchen floor.  Roaches were running around through the kitchen area, and in and out of the refrigerator.  The hallway looked like it was under construction, missing part of a wall.  The bathroom was in similar disarray, the tub was dirty, and excrement was in the toilet. 

The investigator wrote a Child Safety Plan that stated that the children could not go back to the Mulkey address until it was appropriate, all utilities were on, and CPS had approved it.  The parents agreed to the plan.  About a month later, the investigator went back to the Mulkey home.  Although some progress had been made, the house was still in disarray, and the investigator still considered it unsafe and inhabitable.  While Evelyn and the children stayed with various relatives temporarily, these placements did not provide a permanent remedy for the housing crisis.

In June 2001, while the living situation was still unsettled and CPS was still working with the family, all four children were exposed to cocaine in their temporary home with an aunt, Edna.  As a result of that exposure, all four children tested positive for cocaine.  After the tests, Edna told Evelyn that

she knew how the baby got the cocaine in her system.  She said sometimes when she would be done smoking cocaine, she would get the baby and be playing with the baby, and the baby would grab her hands and put her hands in the baby’s mouth.  She told [Evelyn] that she massaged the baby’s gums with her pinky finger.  She said she didn’t know it was messing with the baby.  

W.J.H., Sr. admitted to smoking crack cocaine at home while the children were present.  Evelyn was shocked to hear that the children had cocaine in their systems.  But Evelyn also admitted that she knew both W.J.H., Sr. and Edna were smoking crack cocaine in the home while caring for the children.  Dr. Horner testified that a child with cocaine in her system is being abused by someone.  He also discussed the negative effects of cocaine on the body.  The CPS caseworker testified that exposure to crack endangers a child’s well-being. 

Other evidence showed that the children’s medical needs were being neglected.  After the investigator visited the home on Mulkey in September 2000, she immediately went to the grandmother’s house to see the children.  They were all clean, clothed well, and in good shape physically.  She did note that the two-year-old was scooting on the floor, and Evelyn told her that he could not walk or talk yet.  Evelyn also admitted to her that the children were behind on their immunizations.  The youngest child at the time, D.D.H., had not been to the doctor since he was two weeks old; he was about eight months old at the time of the visit.  The two-year-old had not been to the doctor since he was about four months old.  Evelyn was pregnant with D.N.H. at this time.  Evelyn did not seek prenatal care with D.N.H., despite being ordered to do so. D.N.H., born January 27, 2001, returned to the doctor for the first time on April 24, 2001.  J.J.H., who has cerebral palsy, went almost two years without a doctor’s visit.  CPS had to remind Evelyn to make medical appointments for the children, and she and the children did not attend two-thirds of them.  While family preservation was involved with the case, the baby lost consciousness, after which cocaine was found in her urine.  Additionally, J.J.H. suffered burns that blistered and resulted in thick scabs; Evelyn did not think medical care was needed.  CPS provided antibiotic cream.

Based on the evidence before us, we conclude that “the evidence is such that a factfinder could reasonably form a firm belief or conviction”
(footnote: 51) that Evelyn knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that Evelyn engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children’s physical or emotional well-being.  The evidence is thus factually sufficient to support the jury’s findings on the conduct grounds.

Best Interest

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future; 

(3) the emotional and physical danger to the child now and in the future; 

(4) the parental abilities of the individuals seeking custody; 

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody; 

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and 

(9) any excuse for the acts or omissions of the parent.
(footnote: 52)

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.
(footnote: 53)  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children.
(footnote: 54)  On the other hand, the presence of scant evidence relevant to each 
Holley
 factor will not support such a finding.
(footnote: 55)
 As detailed above, the evidence at trial showed that Evelyn knowingly left her children at home in the care of their father and aunt while they smoked crack, that she neglected her children’s medical needs, and that she did not provide stable, safe housing for them.  The evidence also demonstrated that she visited with the children regularly, completed a psychological evaluation, and completed parenting classes.  According to the testimony, however, she neglected to obtain steady employment and stable, safe housing; she also failed to follow through on the steps necessary to obtaining public assistance and failed to complete other life skills classes required by her service plan.  Three of the children have lived together in one foster home since the removal; this foster home is a potential adoptive placement, according to the CPS caseworker.  J.J.H., the child with disabilities, is in a therapeutic home with a foster parent who has had training in providing for his special needs.  There is no indication that he would be adopted along with his siblings.  Despite this disturbing fact, when considering all of the evidence, we must conclude that 
the jury “could reasonably form a firm belief or conviction”
(footnote: 56) that termination of Evelyn’s parental rights is in the children’s best interest.  The evidence is thus factually sufficient to support the jury finding on the issue of best interest.  Because we have held that the evidence is factually sufficient to support the jury findings, we overrule Evelyn’s third point.

Conclusion

Having overruled all of Evelyn’s points, we affirm the trial court’s judgment.

LEE ANN DAUPHINOT

JUSTICE

PANEL B: DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED:  June 19, 2003 

FOOTNOTES
1:
See
 
Tex. Fam. Code Ann. 
§
 161.001(1)(D), (E), (2) (Vernon 2002).

2:
See Tex. Dep’t of Human Servs. v. E.B.
,
 
802 S.W.2d 647, 648 (Tex. 1990) (approving separate broad-form question for each child); 
In re J.M.M.
, 80 S.W.3d 232, 245, 250 (Tex. App.—Fort Worth 2002, pet. denied) (same) (disapproved of on other grounds by 
In re J.F.C.
, 96 S.W.3d 256, 267 (Tex. 2003)).

3:
See E.B.
, 
802 S.W.2d at 648; 
J.M.M.
, 80 S.W.3d at 245, 250;
 
see also
 
Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges (Family)
 PJC 218.1 & cmt. (2002).

4:
State Dep’t of Highways & Pub. Transp. v. Payne
, 
838 S.W.2d 235, 241
 (Tex. 1992) (op. on reh’g); 
Tex. R. Civ. P.
 274.

5:
Payne
, 838 S.W.2d at 241; 
see Rowe v. Rowe
, 887 S.W.2d 191, 198 (Tex. App.—Fort Worth 1994, writ denied)
 (holding objection first made in postverdict motion to disregard jury findings untimely).

6:
See Casteel-Diebolt v. Diebolt
,
 
912 S.W.2d 302, 304 (Tex. App.—Houston [14
th
 Dist.] 1995, no writ) (holding that appellant who agreed to jury charge is estopped from complaining on appeal that charge was defective)
.

7:
See Pat Baker Co. v. Wilson
, 971 S.W.2d 447, 450 (Tex. 1998) (holding appellate court cannot reverse a case on a ground not presented in the briefs); 
see also J.F.C.
, 96 S.W.3d at 259 (holding that the concept of fundamental error cannot be used to bypass rule 279); 
Wal-Mart Stores, Inc. v. Alexander
, 868 S.W.2d 322, 328 (Tex. 1993) (stating that fundamental error exists “in those rare instances in which the record shows the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution of Texas”).

8:
Tex. Fam. Code Ann. 
§ 263.405(b).

9:
Id.

10:
Holick v. Smith
, 685 S.W.2d 18, 20-21 (Tex. 1985); 
In re D.R.L.M.
, 84 S.W.3d 281, 288 (Tex. App.—Fort Worth 2002, pet. denied); 
In re D.T.
, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied).
  

11:
D.R.L.M.
, 84 S.W.3d at 290-91.

12:
In re J.B.W.
, 99 S.W.3d 218, 221 (Tex. App.—Fort Worth 2003, pet. filed).

13:
See Bennett v. Cochran
, 96 S.W.3d 227, 229 (Tex. 2002) (stating that an appellant who requested a partial record but completely failed to submit a statement of points under Texas Rule of Appellate Procedure 34.6(c) would automatically lose on appeal, but adopting a relaxed approach and rejecting strict compliance with the rule “when a rigid application . . . would result in denying review on the merits, even though the appellee has not established any prejudice”).

14:
See
 
Tex. R. App. P.
 34.6(c).

15:
See CMM Grain Co. v. Ozgunduz
, 991 S.W.2d 437, 439 (Tex. App.—Fort Worth 1999, no pet.); 
see also In re R.C.
, 45 S.W.3d 146, 148 (Tex. App.—Fort Worth 2000, no pet.), 
overruled by Bennett
, 96 S.W.3d at 229.

16:
See Bennett
, 96 S.W.3d at 229.

17:
D.R.L.M.
, 84 S.W.3d at 289.

18:
Tex. Fam. Code Ann. 
§ 263.405(f).

19:
See id.
 263.405(g).

20:
Tex. Gov’t Code Ann. 
§ 311.021(3) (Vernon 1998)
; D.R.L.M.
, 84 S.W.3d at 290.

21:
D.R.L.M.
, 84 S.W.3d at 290.

22:
See Banda v. Garcia
, 955 S.W.2d 270, 272 (Tex. 1997) (holding that complaint on appeal must be same as that raised in trial court and that appellate court cannot reverse based on complaint not raised in trial court); 
see also Seymour v. Gillespie
, 608 S.W.2d 897, 898 (Tex. 1980) (stating that “[a] general objection to an insufficient predicate will not suffice”).

23:
Mancorp, Inc. v. Culpepper
, 802 S.W.2d 226, 230 (Tex. 1990); 
City of Keller v. Wilson
, 86 S.W.3d 693, 709 (Tex. App.—Fort Worth 2002, pet. filed).

24:
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982).

25:
In re C.H.
, 89 S.W.3d 17, 26 (Tex. 2002).

26:
T
EX
. F
AM
. C
ODE
 A
NN
. § 161.206(b); 
Holick
, 685 S.W.2d at 20.

27:
Holick,
 685 S.W.2d at 20-21;
 D.T.
, 34 S.W.3d at 630.

28:
T
EX.
 F
AM.
 C
ODE
 A
NN.
 § 161.001; 
Richardson v. Green
, 677 S.W.2d 497, 499 (Tex. 1984); 
Swate v. Swate
, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).

29:
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

30:
T
EX
. F
AM
. C
ODE
 A
NN
. §§ 161.001, 161.206(a); 
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980).

31:
G.M.
, 596 S.W.2d at 847; 
D.T.
, 34 S.W.3d at 630.

32:
Tex. Fam. Code Ann.
 § 101.007.  

33:
C.H.
, 89 S.W.3d at 25.

34:
Id
.

35:
Id
.

36:
Id
. at 28.

37:
In re
 
A.R.R.
, 61 S.W.3d 691, 698 (Tex. App.—Fort Worth 2001, pet. denied) (disapproved of on other grounds by 
C.H
., 89 S.W.3d at 26).

38:
See
 
Tex. Fam. Code Ann. 
§
 161.001(1)(D), (E).

39:
Boyd
, 727 S.W.2d at 533; 
see also In re M.C.,
 917 S.W.2d 268, 269 (Tex. 1996) (per curiam).

40:
Phillips v. Tex. Dep’t of Protective & Regulatory Servs.
, 25 S.W.3d 348, 354 (Tex. App.—Austin 2000, no pet.).

41:
Phillips
, 25 S.W.3d at 354
; 
M.C.
, 917 S.W.2d at 270.

42:
Tex. Fam. Code Ann. 
§ 161.001(1)(D); 
D.T.
, 34 S.W.3d at 632.

43:
In re D.M.
, 58 S.W.3d 801, 811-12 (Tex. App.—Fort Worth 2001, no pet.).

44:
Id.

45:
Boyd
, 727 S.W.2d at 533;
 D.M.
, 58 S.W.3d at 811.

46:
D.M.
, 58 S.W.3d at 811; 
Dir. of Dallas County Child Protective Servs. Unit v. Bowling
, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no pet.). 

47:
D.M.
, 58 S.W.3d at 811.

48:
Lucas v. Tex. Dep’t of Protective & Regulatory Servs.
, 949 S.W.2d 500, 503 (Tex. App—Waco 1997, writ denied) (disapproved of on other grounds by 
J.F.C
., 96 S.W.3d at 267); 
Bowling
, 833 S.W.2d at 733; 
Clark v. Clark
, 705 S.W.2d 218, 219 (Tex. App.—Dallas 1985, writ dism’d);
 see also D.T.
, 34 S.W.3d at 636-37 (stating that “evidence of conduct before a child is born, as well as evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct . . . has been established”).

49:
Lucas,
 949 S.W.2d at 503 (holding Lucas’s sexual abuse of one child endangered all of his children living in the home at the time abuse occurred); 
Bowling
, 833 S.W.2d at 732-34; 
see Navarrette v. Tex. Dep’t of Human Resources
, 669 S.W.2d 849, 850 (Tex. App.—El Paso 1984, no writ) (upholding termination of parental rights over child taken into custody from hospital after birth who was not subjected to deplorable living conditions of six siblings); 
In re B.J.B.
, 546 S.W.2d 674, 675 (Tex. Civ. App.—Texarkana 1977, writ ref’d n.r.e.) (upholding termination of father’s parental rights to daughters playing in bedroom while he stabbed mother in kitchen); 
but see Lane v. Jefferson County Child Welfare Unit
, 564 S.W.2d 130, 132 (Tex. Civ. App.—Beaumont 1978, writ ref’d n.r.e.), 
overruled by
 
In re B.B.
, 971 S.W.2d 160 (Tex. App.—Beaumont 1998, writ denied).

50:
D.M.
, 58 S.W.3d at 812; 
Bowling
, 833 S.W.2d at 734 (treating evidence of sexual abuse of older son as evidence of endangerment of child not yet born at the time); 
Clark,
 705 S.W.2d at 219; 
Navarette
, 669 S.W.2d at 850.  

51:
C.H.
, 89 S.W.3d at 25-26.

52:
Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).  

53:
C.H
., 89 S.W.3d at 27.

54:
Id.

55:
Id.

56:
C.H.
, 89 S.W.3d at 25-26.