

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 2-08-215-CV

IN THE INTEREST OF J.A.W., J.A.W.,
J.E.W., AND J.A.W., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant Jason W. appeals the order terminating the parent-child relationship between him and his four children. We affirm.

### Background

The Texas Department of Family and Protective Services ("the Department") filed a petition to terminate the parent-child relationship between Starla H. and six of her children—Alice, Betty, Charles, David, Eric, and Flora

---

[1] See Tex. R. App. P. 47.4.

(all pseudonyms) and between the children and their respective fathers. Jason is the father of Charles, David, Eric, and Flora and was married to Starla at the time of trial. This appeal concerns only the relationship between Jason and his four children.

Susan Rial, a Department investigator, testified that she received a referral in March 2004 concerning Starla and Jason when Starla accused Jason of sexually abusing her daughters, having guns in the family home, and dealing and using drugs. Jason accused Starla of having a crack cocaine problem and told Rial that Starla would be away from home for days at a time on crack binges. Rial asked Jason to submit to a drug test; he refused to submit to the test immediately as Rial requested, but when he did submit to the test, it was negative. Starla's seventh child—Gertrude (a pseudonym)—told Rial that Jason had shown her his penis and asked her to scratch it, but she refused. Alice told Rial that she was aware of her mother's drug use and described an occasion when Starla grabbed the steering wheel of a moving car and tried to run the car off the road while stating that she did not want to live anymore. The Department offered services to Starla and Jason so that the three boys could remain in the home. Later, Starla told Rial that her original allegations against Jason were false. Eventually, the Department agreed to allow the girls to live with a relative in Louisiana while the boys remained with Starla and Jason.

2

Jason told Rial that he would not allow Starla in the family home if she used drugs again. Rial said that the disposition of the sexual abuse allegation against Jason was "[r]eason to [b]elieve."

Rial testified that she received another referral in July 2004 concerning, among other things, allegations that Jason had "pulled a shotgun" on Starla. Law enforcement officers also reported that Starla was using drugs and that "the house was a mess, dirty diapers lying around with flies." Rial discovered that Jason, Starla, and the boys were living with Starla's mother, Peggy; Alice was living there, too, not in Louisiana as Jason and Starla had agreed. Starla told Rial that she was just coming off another crack binge and that she wanted to get into a rehabilitation program. Starla also told Rial that the family car had recently been stolen and that it had $5,000 cash in it at the time; this concerned Rial because Starla had previously told her that Jason dealt drugs. Jason refused to take a drug test. Rial told Jason and Starla that she was reopening their case for safety services and that "this time it would have to happen." Rial determined that Jason, Starla, and the children could stay with Peggy for the time being.

Rial lost contact with Jason and Starla when they left Peggy's apartment with the boys (Alice continued to live with Peggy). In September, Rial learned that Jason had been arrested for charges stemming from the shotgun incident,

3

and Starla told her that she was pressing charges for "beating her and pulling a shotgun on her." Starla agreed to go into drug treatment and leave the children with Peggy. Jason told Rial that he did not think the children would be safe with Starla. Rial eventually closed the case with the disposition "[r]eason to [b]elieve for neglectful supervision" and "physical neglect" against both Jason and Starla. Rial also testified that Jason "took action such as calling the police or making reports because he felt that his children would not be safe with Starla."

Kamesha Gray, another Department investigator, testified that she received a neglectful-supervision referral concerning the family in March 2006. She learned that Jason was in prison and that the children were home alone for up to a week without Starla. Gray interviewed Gertrude, who said that the children had been home alone for a week after Starla said she was "going to pick up some chicken and . . . never returned." Gertrude said that Alice was taking care of the other children. Gertrude also said that Starla was pregnant and using drugs. Betty and Charles essentially told Gray the same thing. Gray also interviewed Alice, whom she described as "very, very upset" because she was "having to basically support children at [age] 13 and go to school." The Department arranged for the children to stay with family friends.

4

Gray located Starla, who admitted to having left the children alone, agreed to place the children with the family friends, and said she would "do anything that it took" to get the kids back. Starla entered a twenty-eight-day in-patient rehabilitation program.

Gray transferred the case to Department caseworker Lamorra Cornelius. Cornelius testified that Starla was discharged from the rehabilitation program after about two weeks because of her advanced pregnancy. After her discharge, Starla continued to attend outpatient rehabilitation sessions and parenting classes. Cornelieus was not able to verify that Starla completed the classes. Jason remained incarcerated. Meanwhile, the children's temporary placement with family friends broke down, so the Department allowed them to return to Starla. After the children returned to her, Starla stopped attending rehabilitation sessions and parenting classes and failed to submit to drug testing when so requested. Flora was born about thirty days after the Department returned the other children to Starla. Although Cornelius was concerned that the children were not safe with Starla, she had no choice but to close the case, which she did in October 2006.

Another Department investigator, Florence Olugbuyi, received a referral involving Starla and the children in December 2006 after police found the children at home alone. Alice told her that Starla had been gone for several

days and was using drugs again. Jason was still incarcerated, and Olugbuyi learned that Starla was in jail, too. The Department placed the children in foster care. Olugbuyi interviewed Starla in jail, and Starla told her that Jason was incarcerated because he had been in a car with someone who had drugs on him. Starla told Olugbuyi that she did not intend to be involved with Jason again. Starla was allowed visitation with the children upon her release from jail, and Olugbuyi said that the visits were appropriate and that the children appeared to be bonded with Starla. Olugbuyi saw no indication that Jason ever tried to contact the children.

Whitney Lagadinos, another Department caseworker, testified that Charles told her that Jason had tried to cut Starla with a knife and that Charles and his siblings had witnessed the altercation. She also testified that Jason had convictions for possession of controlled substances and for possession of a short-barreled firearm, a deferred adjudication for assault/bodily injury to a family member, and a judgment nisi for evading arrest.

Jeremy Pike, a Department caseworker, testified that Starla told him that Jason had tried to kill her in August 2007. He said that Starla relapsed into cocaine use in August and November 2007. Pike testified that Jason had not participated in any service plans. At the time of trial, Charles was living at the Nacogdoches Boys' Ranch, where he continued "to improve and improve."

6

David and Eric were living with a foster family and attending a Head Start program. Pike said that the children were very bonded to one another, and the Department's plan was for one family to adopt all four of Jason's children.

Arlington police officer Barbara Kelly testified that she responded to a domestic violence call in October 2007 and found Jason holding a butcher knife to a pregnant woman's throat. Apparently, Starla was also present—she was listed on the police report as a victim—but she was not the woman Jason threatened with the knife.

Jason testified that he was incarcerated at the time of trial and had been since October 2007 (he also described an earlier period of incarceration, but the testimony is confusing). He said, "[I]f you want me to sign a paper right now saying to trade my life for [the children's] freedom to whoever I choose, I will sign that paper, but I'm never going to relinquish my rights, because I love my children." But he was unable to provide an answer when asked where the children would go if the trial court relinquished them to his custody other than saying, "I'm sure I have family members that would at least help me get on my feet and they wouldn't leave my children without food."

The trial court found that Jason had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children, engaged in conduct or

7

knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children, and constructively abandoned the children. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N) (Vernon Supp. 2008). The trial court further found that termination was in the children's best interest, and it terminated the parent-child relationship between Jason and his children and appointed the Department to serve as their permanent managing conservator.

## Discussion

In four issues, Jason argues that the evidence is factually insufficient to support the grounds for termination and the trial court's best-interest finding.

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes

8

in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2002). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

When reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provisions of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## 1. Endangering Conduct

In his second issue, Jason argues that the evidence is factually insufficient to support the trial court's endangering-conduct finding. He argues that the evidence proves he was a good father when he was not in jail and that when he was in jail, he had no control over the conditions and conduct to which the children were exposed.

The record shows that even when Jason was not incarcerated, he failed to protect his children from Starla's days-long cocaine binges and absences

from the family home. Rial conceded that Jason would call the police when he thought it was unsafe to leave the children with Starla, but the record also shows that he did nothing to remove the children from that environment. To the contrary: he made the environment worse by dealing drugs out of the home; the children told Department employees that white powder and scales were in plain view in the family home. Further, Jason refused the Department's request for one drug test and delayed another, from which a factfinder could reasonably infer that he was taking drugs, too. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.); *In re D.M.*, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.). A parent's failure to remain drug-free while under the Department's supervision will support a finding of endangering conduct under subsection (E) even if there is no direct evidence that the parent's drug use actually injured the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (holding mother's drug use while failing to protect children constituted endangerment without need to show that she directed her conduct at child or that child actually suffered injury). Jason also behaved violently in the family home; on one occasion, he threatened Starla with a shotgun, and on another occasion, he attempted to cut her with a knife in front of the children.

11

Moreover, although Jason argues that his incarceration weighs against a finding of endangerment, we have previously held that imprisonment is a fact properly considered on the issue of endangerment and can support a finding of endangerment. *In re D.M.*, 58 S.W.3d at 812 (citing *Boyd*, 727 S.W.2d at 533–34). The State need not show that the incarceration itself was a result of a course of conduct endangering the child; it need only show that incarceration was part of a course of conduct endangering the child. *Id*. "Thus, if the evidence, including imprisonment, proves a course of conduct that has the effect of endangering the child, the requirement of subsection E is met." *Id.* (citing *Boyd*, 727 S.W.2d at 533–34).

It appears from the record that Jason was incarcerated during most of the time that the Department was involved with his family. At the time of trial in May 2008, Jason had been jailed since October 2007, and he had also been in jail from March 2007 until June 2007. Before that, he had also been in jail for eleven months for possession of a controlled substance. He may not have been able to influence the children's environment when he was in jail, but the fact that he engaged in behavior that resulted in incarceration and left his children to cope with their drug-addicted mother on multiple occasions is some evidence of endangering conduct. The conduct for which Jason was jailed at the time

12

of trial is particularly significant, namely, assaulting a pregnant woman with a butcher knife.

Based on the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Jason engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. *See C.H.*, 89 S.W.3d at 28. Therefore, the evidence is factually sufficient to support the trial court's findings under section 161.001(1)(E). We overrule Jason's second issue. Because a finding of a single violation of 161.001(1) will support termination when coupled with a finding that termination is in the children's best interest, we need not address Jason's first and third issues, in which he argues that the evidence is factually insufficient to support the trial court's findings that he violated paragraphs (D) and (N) of section 161.001(1). *See* Tex. Fam. Code Ann. § 161.001(1); Tex. R. App. P. 47.1; *In re W.J.H.*, 111 S.W.3d 707, 715 (Tex. App.—Fort Worth 2003, pet. denied).

## 2. Best Interest

In his fourth issue, Jason challenges the factual sufficiency of the trial court's best-interest finding. There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe

environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just

14

one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

In this case, there was no evidence of the children's desires. As for the physical and emotional needs of and dangers to the children now and in the future, the record showed that Jason had no present plan for providing for his children while he was in jail and that the children were doing well in foster care. Nor did Jason explain how he would provide a stable home for his children now or upon his eventual release from jail. He testified that he was willing to die for his children if he could choose with whom they would live, but he could not say who would take care of his children except for the vague statement that his unnamed family members would not allow them to starve. Nor did Jason maintain contact with the children when he was incarcerated. During those rare intervals when Jason was not in jail, he demonstrated poor parenting skills by exposing his children to drug traffic and violence in the family home.

With regard to the programs available to assist the persons caring for the children and the Department's plans for them, Rial testified that she attempted to set up services for Jason and Starla repeatedly. While Starla attempted some services, Jason attempted none; nor did he request a service plan while

15

he was in jail.  Pike testified that the children were adoptable and wanted to place all four of Jason's children with one family.

From this evidence, a reasonable factfinder could form a firm belief or conviction that termination of Jason's parental rights is in the children's best interest.  Thus, we hold that the evidence is factually sufficient to support the trial court's best-interest finding, and we overrule Jason's fourth issue.

## Conclusion

Having overruled Jason's second and fourth issues, and not reaching his first and third issues, we affirm the trial court's termination order.

PER CURIAM

PANEL:  GARDNER, J.; CAYCE, C.J.; and WALKER, J.

DELIVERED: March 5, 2009