

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-24-00245-CV
_____

IN THE INTEREST OF D.D.J.-C. AND N.M.C.-J., CHILDREN

On Appeal from the 287th Judicial District Court
Parmer County, Texas
Trial Court No. 11728, Honorable Kathryn Gurley, Presiding

February 4, 2025

## DISSENTING OPINION

Before PARKER and DOSS and YARBROUGH, JJ.

*"Justice is not blind to common sense, nor should it be deaf to reality."* Today, the majority minimizes the undeniable dangers of a household where sixteen complete strangers—unvetted, undocumented, and entirely unknown—were harbored under one roof. The majority insists that the Department failed to prove a dangerous environment by clear and convincing evidence. I disagree.

A home is meant to be a refuge, a place of safety for a child. Instead, this mother's home became a hub for instability, secrecy, and ultimately, police intervention. When law enforcement finds cause to raid a residence, it is not because of mere speculation—it is

because danger lurks behind its doors. The presence of these sixteen complete strangers—combined with the chaos and legal jeopardy that followed—created far more than a questionable living situation. It created an environment where risk was not just possible, but inevitable. Because I believe the evidence overwhelmingly establishes a dangerous environment, I respectfully dissent.

The crux of the majority's opinion ignores the practical reality of parenting and common sense. If a child asks to spend the night at a friend's house and tells their parent that the mother will be present—along with sixteen complete strangers—what responsible parent would allow it? None. Because the mere presence of unknown individuals—especially in large numbers and without any vetting—creates an inherently unpredictable and potentially dangerous environment. The majority dismisses this risk as speculative, but their reluctance to acknowledge the obvious defies both logic and parental instinct. If no reasonable parent would willingly place their child in that situation for a single night, how can the majority justify a child living in such conditions indefinitely?

The majority has also now muddied the waters with regard to section 161.001(b)(1)(Q) with simply one sentence in its opinion: "Consequently, we see no evidence to support a finding that Mother was confined or imprisoned for the requisite two-year period ending on July 19, 2024." Without this one sentence in the opinion, I would concur in the well drafted analysis of issue two. However, by including it, the majority now creates an element of the statute that is simply not present in the statutory language.

2

The majority errs in its interpretation of section 161.001(b)(1)(Q) by misapplying fundamental rules of statutory construction. Specifically, the majority ignores the last antecedent rule, which dictates that a qualifying phrase—such as the two-year modifier—applies only to the closest preceding noun or phrase unless a comma clearly extends its reach. Here, the statute states that termination is warranted when a parent has "knowingly engaged in criminal conduct that has resulted in the parent's conviction of an offense; and confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition." Properly read, the two-year requirement applies solely to the inability to care for the child, not to the confinement or imprisonment itself. Yet, the majority improperly extends this limitation, requiring proof that the parent's incarceration will last two years—an interpretation unsupported by the statutory text.

For these reasons, I respectfully dissent.

**ANALYSIS**

**ISSUE ONE—EVIDENCE SUPPORTING TERMINATION UNDER SUBSECTION (D)**

Where the majority and I differ in the analysis is whether the evidence of the presence of complete strangers in the home created an endangering environment under subsection (D). Termination under (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment. *In the Interest of C.E.*, 687 S.W.3d 304, 310 (Tex. 2024) (citations omitted). Proof that a parent specifically caused an injury is not necessary. *Id.* A finding of endangerment is

3

supported "if the evidence . . . shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child." *Id.* (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 534 (Tex. 1987)). Therefore, "endangerment encompasses a larger array of conduct that exposes a child to loss or injury or jeopardizes the child." *In the Interest of R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024) (internal quotations, brackets, and citations omitted).

The case law and instruction from our high court is clear: we do not need evidence of actual injury to uphold a termination under subsection (D), only evidence the environmental conditions had a substantial potential to "[expose] the child to loss or injury or jeopardizes the child." *Id.* The majority points to the care provided by Mother, that she never left them unattended and she separated herself from the complete strangers in the house. Despite the laudable care Mother may have ensured for her children, the evidence included Mother's guilty plea to the crime of harboring illegal aliens under federal law—a class E felony. 8 U.S.C.S. § 1324(a)(1)(A)(iii), (a)(1)(B)(ii).[1]

By pleading guilty to a felony, Mother admitted her "knowing [or] reckless disregard" of the legal status of the persons who were entering her home, however transient or temporary they may be. She admitted by her felony guilty plea she knew the persons who entered her home were there in violation of the law, and a high risk existed that at any moment these persons would be arrested in her home with her children present, which is exactly what happened. By giving them shelter in her home, Mother

---

[1] It is worth emphasizing that Mother's crime—harboring illegal aliens—is classified as a class E felony under federal law. *See* 18 U.S.C. § 3559(a)(5). The majority downplays the gravity of the situation in the home, yet the federal government has deemed this offense serious enough to warrant felony status, rather than a mere misdemeanor. This underscores the inherent risks and legal consequences associated with Mother's conduct—risks the majority improperly minimizes.

herself became engaged in a criminal act, which ran the risk of her own arrest in front of her children, which also happened. The Texas Family Code does not require that endangering "conduct be directed at the child" or that the child "actually suffer[] injury." *In the Interest of C.E.*, 687 S.W.3d at 310 (quoting *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022). Instead, termination under (D) requires that the child's environment is a *source* of endangerment, and the parent's conduct *may* create that dangerous environment. *Id.* (citing *In re W.J.H.*, 111 S.W.3d 707, 715 (Tex. App.—Fort Worth 2003, pet. denied)) (emphasis added). Further, intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child because of the resulting abandonment of the child. *In the Interest of K.L.*, No. 07-16-00236-CV, 2016 Tex. App. LEXIS 11989, at *8 (Tex. App.—Amarillo Nov. 4, 2016, no pet.) (mem. op.) (citing *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)); *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) ("[I]mprisonment is certainly a factor to be considered . . . on the issue of endangerment).[2]

Because of the potential for a raid by law enforcement, the children were at substantial risk of abandonment and thereby could have suffered emotional and physical injury after Mother's arrest. This risk existed at all times Mother was engaged in the activity of harboring persons without legal status, and she admitted to this risk both by her guilty plea and when she testified at the final hearing that she harbored complete strangers in her home. She also admitted at the hearing she did not know the people

---

[2] *See also In re J.F.-G.*, 627 S.W.3d 304, 315–17 (Tex. 2021) ("[M]ultiple criminal episodes of escalating seriousness—together with the duration and consequences of the incarceration, is relevant when the resulting abandonment presents a risk . . . to a child's physical or emotional well-being."); *In the Interest of R.R.A.*, 687 S.W.3d at 281 (father's drug use, homelessness, employment instability, and near-complete abandonment of his children were sufficient for findings under subsections (D) and (E)).

who were in her home.  There is always a potential for danger when it comes to strangers. *In the Interest of R.S.*, 2015 Tex. App. LEXIS 10253, at *11 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.) (citations omitted).  *See also In re J.A.S.*, 2012 Tex. App. LEXIS 8087, at *6 (Tex. App.—Amarillo Sept. 25, 2012, no pet.) (mem. op.) (considering placement of children in the care of strangers as basis for termination).

The word "stranger" appears a few times in the majority's analysis.  It should be noted, there are different types of "strangers" and associated risks:

1. Familiar-Strangers (Known Group, Unknown Individuals)

   o Example: Inviting your church choir over—you may not know every member personally, but you know the group as a whole and trust the organization they are part of.

   o Risk Level: Lower risk because the people are indirectly vetted through a trusted institution or group.  If an issue arises, there is accountability within the organization.

2. Acquaintance-Strangers (Introduced but not truly known)

   o Example: A coworker bringing a friend to your house.  You know your coworker but have no knowledge of the friend's background or character.

   o Risk Level: Moderate risk—while you have a connection to the person, you still lack full knowledge of their intentions, history, or behavior.

3. Complete Strangers (Unknown People, No Connection)

   o Example: Allowing people into your home whom you've never met, have no connection to, and know nothing about (e.g., harboring illegal aliens with no background knowledge of who they are or why they are there).

   o Risk Level: High risk—there is zero vetting, no accountability, and no way to assess potential dangers.  These individuals could have criminal backgrounds, dangerous intentions, or pose a risk to the safety of those in the home.

6

The majority declines to find endangerment from the presence of sixteen complete strangers in Mother's home because she did not explicitly leave her children in their care. Instead, the majority suggests that, had the Department shown evidence of violence, drug use, or other dangerous behavior by the complete strangers, or if Mother had entrusted them with her children's care, the outcome might be different. This reasoning is fundamentally flawed because it ignores the nature of the complete strangers in the home and overlooks the very real dangers of exposing children to unknown, unvetted individuals engaged in criminal conduct.

Unlike a situation where a parent has acquaintances or distant relatives living in the home, Mother had no knowledge of who these individuals were, where they came from, or what risks they posed. These were not merely unfamiliar faces in a known group—they were complete strangers to Mother herself, breaking the law simply by being there. Mother admitted that she had no idea what level of risk these individuals posed to her children, including whether they were engaged in additional criminal activity that could endanger them. The majority's conclusion rests on the assumption that because no specific acts of harm were proven, the situation was not dangerous. This ignores the inherent risk of exposing children to unknown, unvetted individuals who had already demonstrated a disregard for the law.

If these complete strangers had been inclined to harm the children, nothing would have prevented them from doing so. Mother's closed door and mere presence as one adult offered no meaningful protection from sixteen unknown individuals living under the same roof. The law does not require us to wait for a tragedy to occur before recognizing an obviously dangerous environment. The presence of so many complete strangers,

7

coupled with ongoing criminal activity, created an endangering environment that threatened the children's health and safety.

I acknowledge that the mere presence of strangers alone may not always be enough to support termination under subsection (D).  But when viewed in the context of ongoing criminal conduct, the totality of the circumstances created an undeniable risk to the children.  This aligns with the Texas Supreme Court's analysis in *In the Interest of R.R.A.*, which recognized endangerment can be inferred from a course of conduct that presents substantial risks to a child's physical or emotional well-being.  687 S.W.3d at 277.

Here, Mother's decision to harbor complete strangers, engage in unlawful activity, and expose her children to unknown risks created precisely the type of endangering environment the law seeks to prevent.  A reasonable factfinder could form a firm conviction that Mother knowingly placed her children in conditions that threatened their safety.  I would overrule Mother's first issue and affirm the trial court's termination order.

**ISSUE TWO—EVIDENCE SUPPORTING TERMINATION UNDER SUBSECTION Q**

While I concur in the majority's result—the evidence is insufficient to support the trial court's finding—I write separately because I believe the majority has now muddied the waters with regard to section 161.001(b)(1)(Q).  Subsection (Q) permits termination if the parent is found to have:

. . . knowingly engaged in criminal conduct that has resulted in the parent's:

     (i)     conviction of an offense; and

8

> (ii) confinement or imprisonment and inability to care for the child
> for not less than two years from the date of filing the petition[.]

TEX. FAM. CODE ANN. § 161.001(b)(1)(Q).

Where the majority and I differ in our analysis, albeit reaching the same conclusion, is the application of the words "for not less than two years."  The majority incorrectly applies the phrase "for two years" to the words "confinement or imprisonment" as part of its analysis, quoting the burden shifting scheme in our opinion from *In re Caballero* to suggest the Department need only prove the parent will be confined or incarcerated for two years in order to meet its burden under subsection (Q).  53 S.W.3d 391, 397 (Tex. App.—Amarillo 2001, pet. denied) (op. on reh'g).

First, despite the language in our prior precedent, there is no burden-shifting language in the statute, and no basis for imposing such a scheme.  Second, the majority's interpretation ignores the last-antecedent doctrine, which provides "a qualifying phrase in [a statute] must be confined to the words and phrases immediately preceding it to which it may, without impairing the meaning of the sentence, be applied." *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000); *accord In the Interest of C.J.N.-S*, 540 S.W.3d 589, 592 (Tex. 2018) (determining phrase "a parent of the child or another person having physical custody or guardianship of the child under a court order" gives standing to parents regardless of custody under last-antecedent doctrine under TEX. FAM. CODE ANN. § 154.303).[3]  Further, "modifiers are intended to refer to the words closest to them

---

[3] *Cf. City of Corsicana v. Willman*, 147 Tex. 377, 379, 216 S.W.2d 175, 176 (1949) ("[B]ut the [last-antecedent] rule is neither controlling nor inflexible.  It may be rebutted by the circumstances.  It should not be applied without regard to the meaning of the language read as a whole.  It is not applicable when a further extension is clearly required by the intent and meaning of the context.").

in [a] sentence." *Mikob Props. v. Joachim*, 468 S.W.3d 587, 596 (Tex. App.—Dallas 2015, pet. denied) (quoting *Samano v. Sun Oil. Co.*, 621 S.W.2d 580, 581-82 (Tex. 1981)). The qualifying clause applies only to the closest preceding noun or phrase unless a comma clearly extends its reach, as "a 'properly placed comma' can 'cancel' the last-antecedent canon." *TotalEnergies Petrochemicals & Refin. USA, Inc. v. Kinder Morgan Petcoke, LP*, 658 S.W.3d 647, 668 n.39 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 161 (2012)).

Here, the statute states that termination is warranted when a parent has "knowingly engaged in criminal conduct that has resulted in the parent's conviction of an offense; and confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition." Properly read, the two-year requirement applies solely to the inability to care for the child, not to the confinement or imprisonment itself. This interpretation also does not impair the meaning of the sentence, and it reasonably achieves its aims, which is to permit the Department to intervene where, as a result of incarceration, a parent is unable to care for a child for two years or more. *See In the Interest of A.V.*, 113 S.W.3d 355, 360 (Tex. 2003). Our prior decision, *In re Caballero,* also follows this logic, as the parent in that case had been sentenced to serve more than two years in prison and therefore it was reasonably assured he would not be able to care for his child. Yet, the majority improperly extends this limitation, requiring proof that the parent's incarceration will last two years—an interpretation unsupported by the statutory text. Rather, the Department's burden is to show the parent is not only convicted of an

10

offense and confined or imprisoned, but that she will be unable to care for her child for at least two years.

Under the majority's flawed analysis of section 161.001(b)(1)(Q), a parent who is released from confinement after six months but placed in a halfway house or inpatient treatment facility—still unable to care for their child—would evade termination simply because they were not physically imprisoned for two years. This interpretation ignores the statute's focus on the parent's actual ability to provide care, not just the duration of incarceration. The majority's reasoning creates an illogical loophole where a parent who remains functionally incapable of caring for their child due to court-ordered restrictions or institutional placement would nevertheless avoid termination, despite clear statutory intent to protect children from prolonged instability.

Even if I set aside the statutory language issues discussed above and analyze this case under *In re Caballero*, as the majority does, the burden-shifting scheme is not triggered because the Department failed to meet its initial burden. The burden-shifting scheme in *In re Caballero* is only triggered after the Department establishes the parent's "criminal conduct resulted in their incarceration[4] for more than two years." *In re Caballero*, 53 S.W.3d at 397. Here, the Department did not prove that Mother had been confined or imprisoned for more than two years, meaning the burden never shifted to Mother to show she could provide care.

---

[4] It should be noted the word "incarceration" does not appear in the statute. Neither does the phrase "more than two years."

11

Following the statutory language and a simpler approach, I believe the Department failed to demonstrate Mother would be unable to care for her children for not less than two years from the filing of its petition.  I agree with the portion of the majority's conclusion Mother presented sufficient evidence of her ability to care for her children in Guatemala, and, more importantly, the Department presented no evidence she would be unable to care for her children for the required two-year period.  Mother's release from incarceration made it possible to at least arrange for her children's care and provide care herself upon deportation. Therefore, I concur with the conclusion of the majority's opinion on issue two, but not the analysis.  I dissent with respect to any opinion that requires a moving party under subsection (Q) to have to establish confinement or imprisonment must be at least two years.

## CONCLUSION

Only one statutory ground is needed to support termination when there is also a finding that termination is in the child's best interest.  *In re K.C.B.*, 280 S.W.3d 888, 894– 95 (Tex. App.—Amarillo 2009, pet. denied).  Because I found sufficient evidence to uphold the trial court's finding under subsection (D), I would affirm the trial court's judgment.

The majority concludes the evidence is legally and factually insufficient to support termination under either subsection (D) or (Q) but simply reverses the termination order. The majority notes Mother's failure to challenge appointment of the Department as the children's permanent managing conservator.  *See In re J.A.J.*, 243 S.W.3d 611, 716 (Tex. 2007).

12

Rule 43.2 of the Texas Rules of Appellate Procedure describes the types of judgments this Court may render. *See* TEX. R. APP. P. 43.2. In her brief, Appellant prays for reversal of the termination order and a remand of the cause for further consideration.[5] Thus, rendition is precluded. However, pursuant to Rule 43.2(d), the majority should reverse the termination order and remand the cause for further proceedings to determine other issues such as whether Mother is entitled to visitation because the majority's opinion leaves her parental rights intact.

Alex Yarbrough
Justice

---

[5] We are limited to the relief sought by the parties. *See Stevens v. National Educ. Ctrs. Inc.,* 11 S.W.3d 185, 186 (Tex.2000).

13